**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| JAY VANWEZEL AND PAULA VANWEZEL, <br><br> Plaintiffs, <br><br> v. <br><br><br> ATRIUM MEDICAL CORPORATION, MAQUET CARDIOVASCULAR US SALES, LLC; and GETINGE AB, <br><br> Defendants. | *In re: Atrium Medical Corp. C-Qur Mesh Products Liability Litigation* <br> *C.A. No. 16-md-2753-LM, MDL No. 2753* <br><br><br><br> **LONG FORM COMPLAINT AND JURY DEMAND** <br><br><br> **Civil Action No.:** 1:17-cv-00439 |

Plaintiffs, by and through their undersigned counsel, bring this Complaint for damages against Defendants and in support thereof state the following:

1.      This is a device tort action brought on behalf of the above-named Plaintiffs arising out of the failure of Defendants' hernia mesh product. As a result, Plaintiffs JAY VANWEZEL AND PAULA VANWEZEL suffered permanent injuries and significant pain and suffering, emotional distress, lost wages and earning capacity, and diminished quality of life. The Plaintiffs respectfully seek all damages to which he may be legally entitled.

**PARTIES, JURISDICTION & VENUE**

**PLAINTIFFS**

2.      Plaintiffs JAY VANWEZEL AND PAULA VANWEZEL ("Plaintiffs") are, and were, at all relevant times, citizens and residents of Michigan and the United States.

1

**DEFENDANTS**

3.      Atrium Medical Corporation ("Atrium") is incorporated under the laws of Delaware.  At all pertinent times, Atrium's manufacturing and support facilities were located in Hudson, NH.  Atrium is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices including C-QUR Mesh (hereinafter "C-QUR" or "product" or "mesh").

4.      Maquet Cardiovascular US Sales, LLC ("Maquet") is a limited liability company organized under the laws of New Jersey, with its principal place of business located at 45 Barbour Pond Drive, Wayne, NJ 07470.  Since October of 2011, Atrium has operated within, and as a business unit of, Maquet.

5.      Getinge AB ("Getinge") is a Swedish corporation,  organized under the laws of Sweden with its principal place of business in Sweden.  At all times pertinent hereto, Maquet was a wholly-owned subsidiary of Getinge AB.

6.      Getinge is a holding company, the purpose of which is to coordinate the administration, finances and activities of its subsidiary companies, including Maquet and its business unit/division Atrium, and to act as managers and to direct or coordinate the management of its subsidiary companies or of the business, property and estates of any subsidiary company, including Maquet and its business unit/division Atrium.

7.      The financial accounts of Maquet and its business unit/division Atrium are consolidated within those of Getinge.

8.      In 2011, Getinge acquired Atrium through a merger. When Getinge acquired Atrium through a merger, it acquired Atrium's assets and assumed Atrium's liabilities.

**ATRIUM MEDICAL INC.**

| Acquired net assets and goodwill in connection with the acquisition, SEK m | Assets and liabilities at the acquisition date | Adjustment to fair value | Fair value | Description |
|---|---|---|---|---|
| Intangible assets | – | 1,602 | 1,602 | On 1 November 2011, the US-based company Atrium Medical was acquired. The total acquisition price amounted to about USD 680 m (SEK 4,447 m). |
| Tangible assets | 78 | | 78 | |
| Financial assets | 142 | | 142 | |
| Inventories | 145 | | 145 | |
| Receivables | 174 | | 174 | |
| Cash and cash equivalents | 148 | | 148 | |
| Provisions | – | -641 | -641 | Goodwill that arose in conjunction with the transaction is attributable to the expected future ancillary sales trend. Amortisation expenses for acquired intangible assets amount to about SEK 150 m per year. The company has been included in Getinge's sales and operating earnings since 1 November 2011. |
| Current liabilities | -316 | | -316 | |
| | 371 | 961 | 1,332 | |
| Goodwill | | | 3,263 | |
| **Total acquisition with cash and cash equivalents** | | | 4,595 | |
| **Net outflow of cash and cash equivalents due to acquisition** | | | | |
| Cash and cash equivalents paid for the acquisition | | | 4,595 | |
| Cash and cash equivalents in the acquired company at the acquisition date | | | -148 | |
| | | | 4,447 | |

9.      Since the merger, Atrium has operated as a division/business unit of Getinge subsidiary Maquet.

10.      Getinge and Maquet expressly or impliedly assumed Atrium's liabilities, including its pre-acquisition liabilities and, therefore, Getinge and Maquet are liable as Atrium's successors.

11.      Additionally, the post-merger actions of Getinge and Maquet demonstrate a mere continuation of Atrium's product line and business enterprise.  Accordingly, Getinge and Maquet are liable as Atrium's successors.

12.      Getinge is the owner of Atrium, including the rights to Atrium's C-QUR patents. Maquet has direct control over Atrium's activities.  Following the merger with Atrium, Getinge and Maquet have continued to manufacture and sell the same defective C-QUR product line as Atrium under the same brand so as to hold themselves out to the public as a mere continuation of Atrium.  Getinge and Maquet have benefitted, and continue to benefit, from Atrium's brand and goodwill.  The Maquet Getinge Group website ([www.maquet.com](http://www.maquet.com)) lists the C-QUR product as one of Maquet Getinge Group's "biosurgery" products.  Maquet Website, C-QUR Mesh, [http://www.maquet.com/us/products/C-QUR-mesh/?ccid=231](http://www.maquet.com/us/products/C-QUR-mesh/?ccid=231) (last visited Apr. 14, 2017).

3

13.    Defendants Getinge and Maquet represent that Atrium had become "part of 'Maquet Getinge Group.'" *See* Atrium Website, http://www.atriummed.com (last visited Apr. 14, 2017) (stating that "Atrium is now part of Maquet Getinge Group"); *see also,* Atrium Website, Press Release Archive, *Atrium Medical Agrees to be Acquired by Getinge Group for $680* Million, http://www.atriummed.com/News/atriumnews.asp?articleid=60&zoneid=1 (Oct. 3, 2011) (last visited Apr. 14, 2017) (press release detailing the acquisition of Atrium by Maquet Getinge Group).

14.    Getinge and Maquet are also liable for any acts and/or omissions by or through Atrium because it is merely the alter ego, or an instrumentality of Getinge and Maquet.

15.    Publicly-available information, published by Getinge and Maquet, indicates that the Atrium division is being phased out of existence, yet the product line and business is not. Getinge and Maquet now represent themselves as the owners and/or sellers of the C-QUR product line and Atrium is oft referred to as a former designation.    *See e.g.,* Maquet Website, C-QUR Mesh, *https://www.maquet.com/us/workspaces/operating-room/?filter=231* (last visited Apr. 14, 2014) (showing the C-QUR products on the Maquet website, without reference to Atrium, and including in the available product brochures); *see also,* Maquet Website, Contact Us, https://www.maquet.com/us/contact/ (last visited Apr. 14, 2017) (stating that Atrium Medical was the former contact and the proper contact is now Vascular Systems, which uses a "getinge.com" email address, specifically: VSpurchaseorders@getinge.com).

16.    Following the merger, Atrium was so organized and controlled and its business conducted in such manner as to make it merely an alter ego or business conduit of Getinge and Maquet.  Because Atrium's assets and capital are subject to the ownership and control of Maquet

and Getinge, Atrium is undercapitalized, and the failure to disregard Atrium's corporate form would result in the inequitable and unjust result that Plaintiffs may be unable to satisfy any judgment ultimately obtained against Atrium.  Atrium acts as an agent for Getinge and Maquet. Maquet, Getinge and Atrium combine their property and labor in a joint undertaking for profit, with rights of mutual control.

17.    Maquet and Getinge, directly and/or through the actions of their Atrium division and business unit, are and/or have, at all pertinent times, been responsible for the research, development, testing, manufacture, production, packaging, labeling, marketing, promotion, distribution and/or sale of C-QUR Mesh.  Maquet, Getinge, and Atrium shall be referred to hereinafter, collectively, as "Defendants."

18.    Defendants are individually, jointly and severally liable to Plaintiffs for damages resulting from the Defendants' design, manufacture, marketing, packaging, labeling, distribution, sale and placement of its defective mesh products at issue in the instant suit, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

19.    Defendants are vicariously liable for the acts and/or omissions of its employees and/or agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

20.    At all times material to this action, Defendants have designed, patented, manufactured, packaged, labeled, marketed, and sold and distributed a line of C-QUR hernia mesh products. These products were designed primarily for the purposes of treating hernias. These

5

products share common design elements and common defects. Moreover, these products were cleared for sale in the U.S. after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

21.     The products known as C-QUR, C-QUR Mosaic, C-QUR Edge, C-QUR TacShield, C-QUR Lite Mesh V-Patch, and C-QUR Mesh V-Patch, as well as many variations of these products and any unnamed C-QUR mesh products designed and sold for similar purposes are collectively referenced herein as "Defendants' Hernia Mesh Products," "C-QUR Mesh," or "the Products."

## **VENUE AND JURISDICTION**

22.     This Court has subject matter over the parties pursuant to 28 U.S.C. §1332(a)-(c) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and cost.

23.     Defendants have significant contacts with New Hampshire and this District such that they are subject to the personal jurisdiction of this Court.

24.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the State of New Hampshire and in this District. Therefore, pursuant to 28 U.S.C. § 1391(a), venue is proper.

25.     Further, venue is proper in this Court pursuant to 28 U.S.C. §1332(a)-(c) by virtue of the fact that Defendants' products are produced, sold to and consumed by individuals in the State of New Hampshire, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

26.     Defendants have and continue to conduct substantial business in the State of New Hampshire and in this District, distribute Hernia Mesh Products in this District, receive substantial compensation and profits from sales of Hernia Mesh Products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

27.     Defendants conducted business in the State of New Hampshire through sales representatives conducting business in the State of New Hampshire and because Defendants were engaged in testing, developing, manufacturing, labeling, marketing, distributing, promoting and/or selling, either directly or indirectly, and/or through third parties or related entities, Hernia Mesh Products in New Hampshire.

28.     Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendants, because Defendants are present in the State of New Hampshire, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## FACTUAL BACKGROUND

29.     Defendants' C-QUR Mesh was designed, patented, manufactured, labeled, packaged, marketed, sold, and distributed by Defendants at all relevant times herein.

30.     Getinge and Maquet were, at all times relevant hereto, responsible for the actions of Atrium and exercised control over Atrium's functions specific to the oversight and compliance with applicable safety standards relating to, and including C-QUR Mesh sold in the United States. In such capacity, they committed or allowed to be committed tortious and wrongful acts, including the violation of numerous safety standards relating to device manufacturing, quality

assurance/control, and conformance with design and manufacturing specifications. Their misfeasance and malfeasance caused Plaintiffs to suffer injury and damages.

31.     Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, packaging, promotion, distribution and sale of C-QUR Mesh, as well as providing the warnings and instructions concerning the product.

32.     Among the intended purposes for which Defendants designed, manufactured, marketed, and sold C-QUR Mesh was for use by surgeons for hernia repair surgeries—the purpose for which the C-QUR Mesh was implanted in the Plaintiff named in the Short Form Complaint.

33.     Defendants' Hernia Mesh Products are designed, intended, and utilized for permanent implantation in the human body.

34.     Defendants represented to Plaintiffs and Plaintiff's physicians that C-QUR Mesh was a safe and effective product for hernia repair and for permanent implantation in humans.

35.     Defendants failed to perform and/or rely on adequate testing and research in order to determine and evaluate the risks and benefits of the C-QUR Mesh.

36.     Defendants' C-QUR Mesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with the design. As a result of the defective design and/or manufacture of the C-QUR Mesh, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components, including, but not limited to: chronic pain; recurrence of hernia; foreign body response; rejection; infection; inadequate or failure of incorporation/ingrowth; scarification; improper wound healing; excessive and chronic inflammation; allergic reaction;

adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tissue damage and/or death; and other complications.

37.    The C-QUR Mesh was manufactured from polypropylene, and has a unique Omega 3 fatty acid gel coating derived from fish oil (hereinafter "Omega 3 coating"), which is not used in any other hernia repair product sold in the United States.  The Omega 3 coating was represented by the Defendants to prevent or minimize adhesion and inflammation, and to facilitate incorporation of the mesh into the body, but it did not.  Instead, the Omega 3 coating prevented adequate incorporation of the mesh into the body and caused an intense inflammatory and chronic foreign body response, resulting in an adverse tissue reaction, including damage to surrounding tissue in the form of sclerotic, granulomatous and/or fibrotic tissue, and improper healing.

38.    When affixed to the body's tissue, the impermeable Omega 3 coating of the C-QUR Mesh prevents fluid escape, which leads to seroma formation, and which, in turn, can cause infection or abscess formation, and other complications.

39.    The Omega 3 coating provides an ideal bacteria breeding ground in which the bacteria cannot be eliminated by the body's immune response, which allows infection to proliferate.

40.    The Omega 3 coating of Defendants' C-QUR Mesh is cytotoxic, immunogenic, and not biocompatible, which causes or contributes to complications, such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

41.    Defendants knew or should have known of the cytotoxic and immunogenic properties of the Omega 3 coating of the C-QUR Mesh prior to introducing it into the stream of commerce.

42.     Defendants failed to adequately test the effects of the Omega 3 coating on their C-QUR Mesh in animals and humans, both before and after the product entered the stream of commerce.

43.     When the Omega 3 coating is disrupted and/or degrades, the "naked" polypropylene mesh is exposed to the adjoining tissue and viscera, can become adhered to organs, cause incarceration of organs, and, among other things, can result in severe infections, abscess(es), and/or fistula formation.

44.     Defendants knew or should have known that the Omega 3 coating disrupts and/or degrades eventually, allowing the uncoated mesh to directly contact the adjoining tissue and viscera.

45.     Feasible and suitable alternative procedures and instruments to the C-QUR Mesh, as well as suitable alternative designs for implantation and treatment of hernias and soft tissue repair have existed at all relevant times.

46.     Defendants failed to design and establish a safe, effective procedure for removal of the C-QUR Mesh; thus, in the event of a failure, injury, or other complication, it is impossible to easily and safely remove the C-QUR Mesh.

47.     Due to serious problems with sterilization and quality control in the Atrium manufacturing facilities, the Omega 3 coating was not uniformly applied to the C-QUR Mesh devices.  The Omega 3 coating applied to the mesh caused or contributed to the propensity of the C-QUR Mesh to roll, curl and deform upon insertion into the body, intensifying the inflammatory and foreign body response to the mesh, and exacerbating the lack of adequate incorporation and improper healing response, and potential for adhesion.  The Omega 3 coating was also

10

unreasonably susceptible to deterioration and degradation, and even separation from the polypropylene mesh, both in the packaging and inside the body.  The Omega 3 coating of the C-QUR Mesh also failed to conform to the manufacturer's specifications in terms of shelf-life, thickness, durability, and quality.

48.    Defendants had sole access to material facts concerning the defective nature of the Products and their propensity to cause serious and dangerous side effects.

49.    Upon information and belief, Defendants adjusted the threshold for reporting and recalling the C-QUR mesh due to non-conformities and adverse event reports, resulting in a large number of injurious events, deemed by Defendants to be acceptable, to go unreported.

50.    Upon information and belief, Defendants misled physicians about potential adverse events and attempted to convince physicians of alternative causes other than the C-QUR Mesh.

51.    Upon information and belief, Defendants "stealth recalled" multiple types of C-QUR Mesh that were experiencing high levels of adverse events by simply halting production of certain types of C-QUR Mesh without notifying consumers or physicians of the recall or high levels of adverse events.

52.    Upon information and belief, Defendants manipulated altered, skewed, slanted, misrepresented, and/or falsified pre-clinical and/or clinical studies to bolster the perceived performance of the C-QUR Mesh and/or diminish adverse events.

53.    Upon information and belief, Defendants paid doctors, surgeons, physicians, and/or clinicians to promote the C-QUR Mesh, but did not readily disclose this information.

54.    Defendants marketed and sold the C-QUR Mesh to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies.  These

campaigns and strategies include, but are not limited to, aggressive marketing to healthcare providers at medical conferences, hospitals, and private offices, as well as the provision of valuable benefits to healthcare providers.  Defendants further utilized documents, patients, brochures, and websites.

55.     Defendants have, at all times relevant hereto, provided incomplete, insufficient, and misleading training and information to physicians, in order to increase the number of physicians utilizing C-QUR Mesh, thereby increasing sales.  This has led to the dissemination of inadequate and misleading information to patients, including Plaintiffs.

56.     Upon information and belief, Defendants have been notified about the widespread catastrophic complications associated with the C-QUR Mesh by leading hernia repair specialists, surgeons, hospitals, patients, internal consultants, and/or employees. However, not a single C-QUR Mesh has been formally recalled from the market.  Defendants have misrepresented the efficacy and safety of the C-QUR Mesh, through various means and media, actively and intentionally misleading the medical community, patients, and the public at large.

57.     Defendants' C-QUR Meshes have been and continue to be marketed to the medical community and to patients as safe, effective, reliable medical devices, implanted by safe and effective surgical techniques for the treatment of hernia repair and soft tissue repair, and as safer or more effective as compared to the traditional products and procedures, including competing hernia mesh products.

58.     In reliance on Defendants' representation, Plaintiff's physicians were induced to, and did use, the C-QUR Mesh.

59.     Defendants' C-QUR Meshes were, at all times, utilized and implanted in a manner foreseeable and/or intended by Defendants.

60.     The C-QUR Mesh implanted into Plaintiff was in the same or substantially similar condition as when it left Defendants' possession, and/or in the condition directed by and expected by Defendants.

61.     As a direct and proximate result of having the C-QUR Mesh implanted, Plaintiff has been severely and permanently injured.

62.     These manufacturing and design defects associated with the C-QUR Mesh were directly and proximately related to the injuries suffered by Plaintiff.

63.     Neither Plaintiff nor his implanting physicians were adequately warned or informed by Defendants of the defective and dangerous nature of C-QUR Mesh, including the risks specifically associated with the Omega 3 coating. Moreover, neither Plaintiff nor his implanting physician were adequately warned or informed by Defendants of the risks associated with the C-QUR Mesh.

64.     The C-QUR Mesh implanted in Plaintiff failed to reasonably perform as intended. The mesh caused serious and permanent injuries, resulting in the need for additional treatment, including additional corrective surgery or surgeries.

65.     Plaintiff's severe adverse reactions, and the necessity for additional treatment, directly and proximately resulted from the defective and dangerous condition of the product and Defendants' defective and inadequate warnings about the risks associated with the product.

66.     Plaintiff has suffered, and will continue to suffer, both physical injury and pain and mental anguish, permanent and severe injury, including scarring and disfigurement, lost wages and

earning capacity, and has incurred substantial medical bills and other expenses, resulting from the defective and dangerous condition of the product and from Defendants' defective and inadequate warnings about the risks associated with the product.

67.     The Plaintiffs, in the existence of due diligence could not have reasonably discovered the Defendants' wrongful conduct and the cause of his injuries, including, but not limited to, the defective design and/or manufacturing of the C-QUR until a date within the applicable statute of limitations.

68.     On May 5, 2015, Plaintiff was seen at Spectrum Health United Greenville in Greenville, Michigan for open repair of an umbilical hernia. A circular piece of C-Qur V-Patch mesh was used to repair this defect. This surgery was performed by Kevin O'Connor, D.O..

69.     Defendant, manufactured, sold, and/or distributed the C-QUR Mesh Products to Plaintiffs, through his doctors, to be used for treatment of hernia repair.

70.     On September 18, 2015, Plaintiff presented to Spectrum Health United Greenville in Greenville, Michigan with an infection of the abdominal wall related to the C-Qur mesh implanted on May 8, 2015.  During the operation, it was found that Plaintiffs's C-Qur mesh had caused an inflammatory and infectious process under the umbilicus.   The mesh was removed and discarded.

## COUNT I

### NEGLIGENCE

71.     Plaintiff re-alleges and incorporates by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

72.     At all relevant times, Defendants had a duty to Plaintiffs, to exercise reasonable and ordinary care in the manufacture, design, packaging, labeling, instructions, warnings, sale, marketing, and distribution of the Defendants' C-QUR Mesh, as well as in the recruitment and training of physicians to implant the C-QUR Mesh.

73.     Defendants breached their duty of care to the Plaintiffs, as aforesaid, in the manufacture, design, packaging, labeling, warnings, instructions, sale, marketing, distribution, and recruitment and training of physicians to implant the C-QUR Mesh.

74.     Defendants breached their aforementioned duty by:

    a.  Failing to design the Products so as to avoid an unreasonable risk of harm to the patients in whom the Products were implanted, including the Plaintiff;

    b.  Failing to manufacture the Products so as to avoid an unreasonable risk of harm to patients in whom the Products were implanted, including the Plaintiff;

    c.  Failing to use reasonable care in the testing of the Products so as to avoid an unreasonable risk of harm to patients in whom the Products were implanted, including the Plaintiff;

    d.  Failing to use reasonable care in inspecting the Products so as to avoid an unreasonable risk of harm to patients in whom the Products were implanted, including the Plaintiff; and/or

    e.  Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Products.

75.     The reasons that Defendants' negligence caused the Products to be unreasonably dangerous and defective include, but are not limited to:

15

a. The use of polypropylene material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

b. Biomaterial issues with the design of the Products, including the use of the Omega 3 coating, which decreases the PH in the abdominal cavity, carries a high rate of infection and prevents integration of the mesh.  The use of Omega 3 results in injuries, including, but not limited to, infection, adverse tissue reactions, and recurrence;

c. Biomechanical issues with the design of the Products, including the propensity to shrink or contract inside the body, which causes surrounding tissue to become fibrotic and contract, and results in injury; and/or

d. The propensity of the Products to degrade and fragment inside the body, which causes a chronic inflammatory and fibrotic reaction, resulting in injury over time.

76. Defendants also negligently failed to warn or instruct Plaintiff or his physicians of subjects, including, but not limited to, the following:

a. The cytotoxicity, immunogenic, and biologically incompatible nature of the Omega 3 coating;

b. The unusually high rate of infection associated with the Omega 3 coating.

c.  The propensity of the Omega 3 coating to decrease the PH of the abdominal cavity and/or the blood;

d. The propensity of the Products to roll, curl, and deform upon insertion into the body;

e.   The Products' propensities for deterioration, degradation, and fragmentation;

f.   The lack of quality control with regard to the uniformity of the Omega 3 coating;

g.   The Products' propensity to shrink or contract within the body;

h.   The risk of chronic inflammation resulting from the Products;

i.   The risk of chronic infections resulting from the Products;

j.   The need for corrective surgery to adjust, remove, or revise the Products;

k.   The frequency, severity, and duration of complications associated with the Products;

l.   The Products defects described herein;

m.   Treatment with the Products is no more effective than feasible, available alternatives;

n.   Treatment with the Products exposes patients to more risk than feasible, available alternatives;

o.   Use of the Products put patients at a greater risk of requiring additional surgery than feasible, available alternatives;

p.   Use of the Products makes any future abdominal surgery on the patient much more complex and dangerous than feasible, available alternatives; and/or

q.   Removal of the Products due to complications may significantly impair the patients' quality of life and may not result in complete resolution of their injuries.

17

77.     Defendants knew or should have known that its failure to exercise ordinary care in the manufacture, design, packaging, labeling, warnings, instructions, sale, marketing, distribution and recruitment and training of physicians to implant the C-QUR Mesh would cause foreseeable harm, injuries, and damages to individuals implanted with C-QUR Mesh, including the Plaintiff.

78.     Defendants knew, or in the exercise of reasonably care should have known, that the C-QUR Mesh was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injury patients in whom C-QUR mesh was implanted. Defendants knew or should have known that Plaintiff and his physicians were unaware of the dangers and defects inherent in the C-QUR Mesh.

79.     As a direct, proximate, and foreseeable result of the Defendants' negligence, Plaintiffs have experienced significant mental and physical pain and suffering, have sustained severe and permanent injuries requiring past and future medical treatment, and resulting in disability, impairment, loss of enjoyment of life, loss of care, comfort, and have incurred financial or economic loss, including, but not limited to, obligations for medical expenses, lost income, and other damages.

80.     Each act or omission of negligence was a proximate cause of the damages and injuries to Plaintiff.

WHEREFORE, Plaintiffs demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, enhanced compensatory damages, and such further relief as the Court deems equitable and just.

## COUNT II

## STRICT LIABILITY – DESIGN DEFECT

18

81.    Plaintiffs re-allege and incorporate by reference every paragraph of this Master Complaint as if each were set forth fully and completely herein:

82.    Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the C-QUR Mesh implanted into Plaintiff.  The C-QUR Mesh was defective in its design in that, when it left the hands of Defendants, it was not safe for its anticipated use and safer feasible alternative designs existed that could have been utilized by Defendants.  A reasonably prudent medical device manufacturer would not have placed the C-QUR mesh with its defective design into the stream of commerce.

83.    The C-QUR Mesh was defectively designed when supplied, sold, distributed and/or otherwise placed into the stream of commerce and when it was implanted in Plaintiff.

84.    Defendants expected and intended the C-QUR Mesh to reach users, such as Plaintiffs, in the condition in which the product was sold.

85.    The implantation of the C-QUR Mesh in Plaintiff was medically reasonable, and was a type of use that Defendants intended and foresaw when it designed, manufactured, and sold the Products.

86.    The C-QUR Mesh was unreasonably dangerous, taking into consideration the utility of said product and the risks involved in its use.  The foreseeable risks associated with the design of the mesh were more dangerous than reasonably prudent consumers, such as Plaintiff and/or his physicians, would expect when the mesh was used for its normal and intended purpose.

87.    The Product implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein with respect to its design.  As previously stated, the Products' design defects include, but are not limited to:

19

a.      The use of polypropylene material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

b.      Biomechanical issues with the Products, including, but not limited to, the propensity to contract or shrink inside the body, that in turn cause the surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

c.      The propensity of the Products to degrade and fragment over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time; and/or

d.      The use of the Omega 3 coating decreases the PH of the abdominal cavity, results in a higher rate of infection and prevents tissue integration, resulting in injuries.

88.     The C-QUR Mesh reached Plaintiff's implanting surgeon and was implanted without any substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

89.     The C-QUR Mesh failed to perform as safely as ordinary consumers and/or their physicians would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer, and the risks and dangers of the C-QUR mesh outweigh its benefits. The design defects in the C-QUR mesh were not known, knowable and/or reasonably visible to Plaintiff and his physicians, or discoverable upon any reasonable examination. The C-QUR mesh was used and implanted in the manner in which it was intended to be used and implanted by Defendants pursuant to the instructions for use and the product specifications provided by Defendants.

90.     The risks of the C-QUR Mesh significantly outweigh any benefits that Defendants contend could be associated with the product. The Omega 3 coating, which is not used in any

other hernia mesh product sold in the United States, prevents tissue from incorporating into the mesh, leading to encapsulation, deformation, scarification and contract, migration, erosion and rejection. The impermeable Omega 3 coating leads to seroma formation, provides a breeding ground for infection, and protects bacteria from being eliminate by the body's natural immune response.  The Omega 3 coating also caused immunogenic responses and was known to be cytotoxic.

91.    The Omega 3 coating of the C-QUR Mesh, which was marketed, promoted, and intended as a barrier against adhesion to the bowel was only temporary; it was expected and intended to degrade over time inside the body.  Thus, this coating prevented tissue ingrowth in the short term, and degraded in the long-term, eventually leaving the "naked" polypropylene mesh exposed to the internal viscera and tissues.  Once exposed, the mesh will inevitably adhere to the viscera, initiating a cascade of adverse consequences.  Any purported beneficial purpose of the coating (to prevent adhesion to the bowel and internal viscera) was non-existent; the product provided no benefit while substantially increasing the risks to the patient.

92.    The polypropylene mesh within the defective Omega 3 coating of the C-QUR Mesh was itself dangerous and defective, particularly when used in the manner intended by Defendants. The particular polypropylene material used in the C-QUR Mesh was substandard, adulterated, non-medical grade, and unreasonably subject to oxidative degradation within the body, further exacerbating adverse reactions once the Omega 3 coating degraded.  When implanted adjacent to the bowel and other internal organs, as Defendants intended for C-QUR Mesh, polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation, and bowel strangulation or hernia incarceration, and other injuries.

93.    The appropriate treatment for complications associated with C-QUR Mesh often involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient.

94.    The C-QUR Mesh was designed and intended for intraperitoneal implantation, which required the product to be placed in contact with internal organs, which unnecessarily increased the risks of adhesion, erosion, fistula formation, and other injuries.

95.    At the time the C-QUR Mesh was implanted in the Plaintiff, there were safer, feasible alternative designs for hernia mesh products that would have prevented Plaintiff's injuries.

96.    The C-QUR Mesh cost significantly more than competitive products because of its unique Omega 3 coating, even though the Omega 3 coating provided no benefit to consumers and increased the risks to patients implanted with these devices.

97.    The defective and unreasonably dangerous condition of the C-QUR Mesh was the proximate cause of the damages and injuries complained of by Plaintiff.

98.    As a direct and proximate result of the C-QUR Mesh's aforementioned design defects, Plaintiffs have experienced significant mental and physical pain and suffering, have sustained severe and permanent injuries requiring past and future medical treatment, and resulting in disability, impairment, loss of enjoyment of life, loss of care, comfort, and has incurred financial or economic loss, including, but not limited to, obligations for medical expenses, lost income, and other damages.

99.    Defendants are strictly liable to Plaintiffs for designing, manufacturing, marketing, selling and/or distributing defective products.

WHEREFORE, Plaintiffs demands judgment against Defendants, and each of them,

individually, jointly, severally and in the alternative, and request compensatory damages, enhanced compensatory damages, and such further relief as the Court deems equitable and just.

## COUNT III

## STRICT LIABILITY – MANUFACTURING DEFECT

100.    Plaintiffs re-allege and incorporate by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

101.    Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the Product implanted in Plaintiff.  The Product was defective in manufacture and construction when it left the hands of Defendants in that the manufacture and construction deviated from good manufacturing practices and/or manufacturing specifications as would be used and/or maintained by a reasonably prudent and careful medical device manufacturer.

102.    The Product implanted in Plaintiff was not reasonably safe for the intended uses and was defective as described herein, as a matter of law, with respect to its manufacture, in that it deviated materially from Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff.

103.    The Product, as manufactured and constructed by Defendants, was unreasonably dangerous to end consumers, including Plaintiff, and posed an unreasonable degree of risk, danger and harm to Plaintiff.

104.    The Product was expected to reach and did reach Plaintiff's implanting surgeon and Plaintiff without substantial change in the condition in which it was manufactured, supplied, distributed sold and/or otherwise placed in the stream of commerce.

105. The manufacturing defects in the Product implanted in the Plaintiff was not known, knowable or readily visible to Plaintiff's physicians or to Plaintiffs, nor were they discoverable upon any reasonable examination by Plaintiff's physicians or Plaintiffs. The C-QUR Mesh was used and implanted in the very manner in which it was intended to be used and implanted by Defendants in accordance with the instructions for use and specifications provided by Defendants.

106. The Product implanted in Plaintiff was different from the intended design and failed to perform as safely as products manufactured in accordance with the intended design would have performed.

107. The defective and unreasonably dangerous condition of the Product was a proximate cause of the damages and injuries suffered by the Plaintiff.

108. As a direct and proximate result of the Product's aforementioned manufacturing defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained severe and permanent injuries requiring past and future medical treatment, and resulting in disability, impairment, loss of enjoyment of life, loss of care, comfort, consortium, and have incurred financial or economic loss, including, but not limited to, obligations for medical expenses, lost income, and other damages.

109. Defendants are strictly liable to the Plaintiffs for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, enhanced compensatory damages, and such further relief as the Court deems equitable and just.

## COUNT IV

## STRICT LIABILITY – FAILURE TO WARN

110.   Plaintiffs re-allege and incorporate by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

111.   Defendants manufacture, design, market, sell and/or otherwise place into the stream of commerce their C-QUR mesh.

112.   The Product implanted in Plaintiff was not reasonably safe for the intended uses and was defective as described herein, as a matter of law, due to the lack of appropriate and necessary warnings.  As described herein, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.  Among other subjects, Defendants did not provide sufficient or adequate warnings regarding:

a.   The cytotoxicity, immunogenic, and biologically incompatible nature of the Omega 3 coating;

b.   The propensity of the Omega 3 coating to decrease the PH of the abdominal cavity and/or the blood;

c.   The propensity of the Products to roll, curl, and deform upon insertion into the body;

d.   The unusually high rate of infection associated with the Products;

e.   The risks associated with the Omega 3 coating;

f.   The frequency of recurrence due to a lack of tissue integration;

g.   The Products' propensities to contract, retract, and/or shrink inside the body;

25

h.   The Products' propensities for deterioration, degradation, fragmentation, and/or disintegration;

i.   The risk of chronic inflammation resulting from the Products;

j.   The risk of chronic infections resulting from the Products;

k.   The risk of recurrent, intractable pain resulting from the Products;

l.   The need for corrective or revision surgery to adjust or remove the Products;

m.   The frequency, severity, and duration of complications that could arise as a result of the implantation of the Products;

n.   The hazards associated with the Products;

o.   The Products' defects as described herein;

p.   Treatment with this Products is no more effective than feasible, available alternatives;

q.   Treatment with the Products exposes patients to greater risks than feasible, available alternatives;

r.   Use of the Products puts the patient at a greater risk of requiring additional surgery than feasible, available alternatives;

s.   Use of the Products makes any future abdominal surgery on the patient much more complex and dangerous than feasible, available alternatives;

t.   Removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and/or

u.   Complete removal may not result in complete resolution of the complications, including pain.

113.   The Defendants failed to properly and adequately warn and instruct Plaintiff and

his treating physician that C-QUR mesh was designed and/or manufactured in a way that could cause injuries and damages, including lasting and permanent injuries.  Defendants further failed to inform and/or warn Plaintiff and his treating physicians with respect to the most effective proper technique and methods of implantation and/or the selection of appropriate candidates to receive C-QUR Mesh.

114.    The Defendants failed to properly and adequately warn and instruct Plaintiff and his treating physicians as to the risks of the Defendants' C-QUR Mesh. To the contrary, Defendants withheld information from Plaintiff and his treating physicians regarding the true risks related to implantation of their C-QUR mesh.

115.    The Defendants failed to properly and adequately warn and instruct Plaintiff and his treating physicians that inadequate research and testing of the C-QUR Mesh was done prior to C-QUR mesh being placed on the market and in the stream of commerce and that Defendants' lacked a safe, effective procedure for removal of the C-QUR Mesh once complications from the same arise.

116.    The Defendants intentionally, recklessly, and maliciously misrepresented the efficacy, safety, risks, and benefits of C-QUR Mesh, understating the risks and exaggerating the benefits in order to advance their own financial interest, with wanton and willful disregard for the rights, safety and health of Plaintiff.

117.    Plaintiff and his physicians were unaware of the defects and dangers of C-QUR Mesh, and were unaware of the frequency, severity and duration of the risks associated with the C-QUR Mesh.

27

118.    Defendants' Instructions for Use provided with the C-QUR Mesh expressly understates and misstates the risks known to be associated specifically with the C-QUR Mesh by representing that the complications associated with C-QUR Mesh were the same as those "with the use of any surgical mesh." No other surgical mesh sold in the United States has the dangerous and defective Omega 3 coating, which itself causes or increases the risks of numerous complications, including the prevention of incorporation, increased risk of seroma formation, immunologic response, increased risk for infection, and increased inflammatory and foreign body response. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the C-QUR Mesh.

119.    Defendants' Instructions for Use failed to adequately warn Plaintiff's physicians of numerous risks which Defendants knew or should have known were associated with the C-QUR Mesh, including the risks of the product's inhibition of tissue incorporation, pain, immunologic response, dehiscence, encapsulation, rejection, migration, scarification, contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, bowel obstruction, or hernia incarceration or strangulation.

120.    Defendants failed to adequately train or warn Plaintiff or his physicians about the necessity for invasive surgical intervention in the event of complications, or how to properly treat such complications when they occurred.

121.    Defendants failed to adequately warn Plaintiff or his physicians that the surgical removal of the C-QUR Mesh, in the event of complications, would leave the hernia unrepaired and would necessitate further medical treatment to attempt to repair the same hernia that the failed C-QUR Mesh was intended to treat.

28

122.    Defendants represented to physicians that the Omega 3 coating would prevent or reduce adhesion, and expressly intended for the C-QUR Mesh to be implanted in contact with the bowel and internal organs.  Defendants marketed and promoted the Product for said purpose. Defendants failed to warn Plaintiffs or his physicians that the Omega 3 coating prevented tissue ingrowth, which is the desired biologic response to an implantable mesh device.  Defendants failed to warn Plaintiff or his physicians that the Omega 3 coating was only temporary and therefore, at best, would provide only a temporary adhesion barrier and when the coating eventually degraded, the exposed polypropylene would become adhered to the bowel or tissue.

123.    With respect to the complications that were listed in Defendants' warnings, Defendants failed to provide information or warnings regarding the frequency, severity, and duration of those complications, even though the complications associated with C-QUR Mesh were more frequent, more severe, and lasted longer than those with safer feasibly alternative hernia repair treatments.

124.    If Plaintiff and/or his physicians had been properly warned of the defects and dangers of C-QUR Mesh, and of the frequency, severity and duration of the risks associated with the C-QUR Mesh, Plaintiff would not have consented to the implant, and Plaintiff's physician would not have implanted the C-QUR Mesh. As a direct and proximate result of the Defendants' design, manufacture, marketing, sale, and distribution of the C-QUR Mesh, Plaintiffs have experienced significant mental and physical pain and suffering, have sustained severe and permanent injuries requiring past and future medical treatment, and resulting in disability, impairment, loss of enjoyment of life, loss of care, comfort, consortium, and has incurred financial

or economic loss, including, but not limited to, obligations for medical expenses, lost income, and other damages.

125. The Defendants are strictly liable to the Plaintiffs for their wrongful conduct in failing to properly warn Plaintiffs and for designing, manufacturing, marketing, labeling, packaging, and/or selling a defective product.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, enhanced compensatory damages, and such further relief as the Court deems equitable and just..

## COUNT V

## BREACH OF EXPRESS WARRANTY

126. Plaintiffs re-alleges and incorporate by reference every paragraph of this as if each were set forth fully and completely herein.

127. At all relevant and material times, Defendants manufactured, marketed, sold, distributed and otherwise placed in to the stream of commerce C-QUR Mesh.

128. In advertising, marketing and otherwise promoting C-QUR Mesh to physicians, hospitals and other healthcare providers, Defendants expressly warranted that their C-QUR Mesh was safe for use and reasonably fit for their intended purposes. In advertising, marketing and otherwise promoting C-QUR Mesh, Defendants' intended that physicians, hospitals and other healthcare providers rely upon their representations regarding safety and fitness in an effort to induce them to implant the Products in their patients.

129. With respect to the Plaintiff, Defendants intended that C-QUR Mesh be implanted by his treating surgeon in the reasonable and foreseeable manner in which it was implanted and in

accordance with the instructions for use and product specifications provided by Defendants. Plaintiff was in privity with Defendants.

130. Defendants expressly warranted to physicians, hospitals, other healthcare providers and the general public including Plaintiff that C-QUR Mesh was safe and fit for use by consumers, that it was of merchantable quality, that its risks, side effects and potential complications were minimal and comparable to other hernia mesh products, that it was adequately researched and tested, and that it was fit for its intended use. Plaintiff and his physicians and healthcare providers reasonably relied upon Defendants' express representations and warranties, and consequently, Plaintiff was implanted with Defendants' C-QUR Mesh.

131. Defendant breached these express warranties because the Product implanted in the Plaintiff was unreasonably dangerous, defective, and not as Defendants had represented.

132. Defendants breached express representations and warranties made to the Plaintiff, as well as his physicians and healthcare providers, with respect to the Product, including, but not limited to, the following particulars:

A. Defendants represented to Plaintiff and his physicians and healthcare providers through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions among other ways that the Defendants' C-QUR Mesh was safe, meanwhile Defendants fraudulently withheld and concealed information about the substantial risks of serious injury associated with using C-QUR Mesh;

B. Defendants represented to Plaintiff and his physicians and healthcare providers that the Defendants' C-QUR Mesh was as safe and/or safer than other alternative

procedures and devices then on the market, meanwhile Defendants fraudulently concealed information that demonstrated that C-QUR Mesh was not safer than alternative therapies and products available on the market; and

C.   Defendants represented to Plaintiff and his physicians and healthcare providers that the Defendants' C-QUR Mesh was more efficacious than other alternative procedures, therapies and/or devices, meanwhile Defendants fraudulently concealed information, regarding the true efficacy of C-QUR Mesh.

133. Defendants' breach of their express warranties resulted in the implantation of unreasonably dangerous and defective product implanted in the Plaintiff, placing said Plaintiff's health and safety in jeopardy.

134. At the time of making such express warranties, Defendants knew or should have known that Defendants' C-QUR Mesh does not conform to the express warranties and Defendants' acts were motivated by financial gain while the adverse consequences of Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence and evidenced reckless indifference to Plaintiffs' rights, health and safety so as to warrant the imposition of punitive damages.

135. As a direct and proximate result of Defendants' breaches of the aforementioned express warranties, Plaintiffs have experienced significant mental and physical pain and suffering, have sustained severe and permanent injuries requiring past and future medical treatment, and resulting in disability, impairment, loss of enjoyment of life, loss of care, comfort, and have incurred financial or economic loss, including, but not limited to, obligations for medical expenses, lost income, and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, enhanced compensatory damages, and such further relief as the Court deems equitable and just.

## COUNT VI

## BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY

## AND FITNESS OF PURPOSE

136. Plaintiffs re-allege and incorporate by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

137. At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold the Defendants' C-QUR Mesh.

138. Defendants impliedly warranted that the Products were merchantable and were fit for the ordinary purposes for which they were intended.

139. Defendants impliedly warranted that their Products were of merchantable quality, safe and fit for the intended use of implantation in Plaintiff and were properly and adequately tested prior to being placed in the stream of commerce.

140. When the Product was implanted in the Plaintiff, it was being used for the ordinary purposes for which they were intended.

141. Defendants intended that their C-QUR Mesh be implanted for the purposes and in the manner that Plaintiff's surgeon implanted the Product, in accordance with the instructions for use and product specifications provided by Defendants.

142. Defendants were aware that consumers, such as the Plaintiff, would be implanted with C-QUR Mesh by their treating physicians in accordance with the instructions for use and

product specifications provided by Defendants.

143. The Plaintiff was a foreseeable user of Defendants' C-QUR Mesh and was in privity with Defendants.

144. Defendants breached implied warranties with respect to the C-QUR Mesh, including the following particulars:

A. Defendants represented to Plaintiff and his physicians and healthcare providers through its labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the Defendants' C-QUR Mesh was of merchantable quality and safe when used for its intended purpose meanwhile Defendants fraudulently withheld and concealed information about the substantial risks of serious injury associated with using C-QUR Mesh;

B. Defendants represented to Plaintiff and his physicians and healthcare providers that the Defendants' C-QUR Mesh was safe, as safe as and/or safer than other alternative procedures and devices, meanwhile Defendants fraudulently concealed information, which demonstrated that the C-QUR Mesh was not safe, as safe as or safer than alternatives and other products available on the market; and

C. Defendants represented to Plaintiff and his physicians and healthcare providers that the Defendants' C-QUR Mesh were more efficacious than other alternative procedures and/or devices, meanwhile Defendants fraudulently concealed information, regarding the true efficacy of C-QUR Mesh.

145. Plaintiff individually and/or by and through his physician, relied upon Defendants'

34

implied warranties in consenting to have the Product implanted.

146.   In reliance upon Defendants' implied warranties, Plaintiff's implanting surgeon used C-QUR Mesh to treat Plaintiff in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants and in accordance with the instructions for use and product specification provided by Defendants.

147.   Defendants breached their implied warranties to Plaintiff because the Product was not of merchantable quality, safe and fit for its intended use, as warranted, nor was it adequately tested prior to being placed in the stream of commerce.

148.   Defendants' breach of their implied warranties resulted in the implantation of unreasonably dangerous and defective product in the body of the Plaintiff, placing said Plaintiff's health and safety in jeopardy.

149.   Defendants' acts were motivated by financial gain while the adverse consequences of the conduct were actually known by Defendants.  Defendants' conduct was outrageous, fraudulent, oppressive, done with malice and with gross negligence, and evidenced reckless disregard and indifference to Plaintiff's rights, health and safety, so as to warrant the imposition of punitive damages.

150.   As a direct and proximate result of Defendants' breach of the aforementioned implied warranties, Plaintiffs have experienced significant mental and physical pain and suffering, have sustained severe and permanent injuries requiring past and future medical treatment, and resulting in disability, impairment, loss of enjoyment of life, loss of care, comfort, and have incurred financial or economic loss, including, but not limited to, obligations for medical expenses, lost income, and other damages

WHEREFORE, Plaintiffs demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, enhanced compensatory damages, and such further relief as the Court deems equitable and just.

## COUNT VII

## PUNITIVE DAMAGES

151.    Plaintiffs re-allege and incorporate by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

152.    Defendants sold their Products to the healthcare providers of Plaintiff, and other healthcare providers throughout the United States without doing adequate testing to ensure that the Products were reasonably safe and effective for permanent, human implantation. Defendants continued to manufacture and sell C-QUR Mesh after obtaining knowledge and information that the product was defective and unreasonably unsafe.

153.    Even though Defendants have other hernia mesh devices that do not present the same risks as the C-QUR Mesh, Defendants developed, designed, and sold C-QUR Mesh, and continue to do so, because the C-QUR Mesh has a significantly higher profit margin than other hernia repair products.  Defendants were aware of the probable consequences of implantation of the dangerous and defective C-QUR Mesh, including the risk of failure and serious injury, such as suffered by Plaintiff.

154.    At all times relevant hereto, Defendants knew or should have known that C-QUR Mesh was inherently more dangerous with respect to the risks of foreign body response, allergic reactions, rejection, infection, failure, erosion, pain and suffering, organ perforation, dense adhesions, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the

conditions proximately related to the use of the products, as well as other severe and personal injuries which are permanent and lasting in nature.

155. Defendants willfully and recklessly failed to avoid those consequences and, in doing so, Defendants acted intentionally, maliciously, and recklessly without regard to the safety of those persons who might foreseeably be harmed by the C-QUR product, including Plaintiff.

156. At all times material hereto, Defendants attempted to misrepresent and did intentionally and knowingly misrepresent facts concerning the safety of their C-QUR Mesh products.

157. Defendants' misrepresentation included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety and efficacy of the C-QUR Mesh, which deprived Plaintiff and his implanting physicians of vitally necessary information with which to make a fully informed decision about whether to use C-QUR mesh.

158. At all times material hereto, Defendants knew and recklessly and/or intentionally disregarded the fact that the Defendants' C-QUR Mesh can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative methods, products, procedures, and/or treatment.

159. At all times material hereto, Defendants knew and recklessly and/or intentionally disregarded the fact that C-QUR Mesh can cause debilitating and potentially life threatening side effects with greater frequency than safer alternative products and/or methods of treatment and recklessly failed to advise the medical community and the general public, including Plaintiffs, of the same.

160.    At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries and the rate of complication caused by and associated with C-QUR Mesh.

161.    Notwithstanding the foregoing and the growing body of knowledge and information regarding the true defective nature of C-QUR Mesh with its increased risk of side effects and serious complications, Defendants continue to aggressively market C-QUR Mesh to the medical community and to consumers without disclosing the true risk of such complications and side effects.

162.    At the time the Plaintiff was implanted with C-QUR Mesh and since that time, Defendants knew that C-QUR Mesh was defective and unreasonably dangerous but continued to manufacture, produce, assemble, market, distribute, and sell C-QUR Mesh so as to maximize sales and profits at the expense of the health and safety of the public in a conscious, reckless and/or intentional disregard of the likely and foreseeable harm caused by C-QUR Mesh to members of the public including Plaintiffs.

163.    At all times material, Defendants have concealed and/or failed to disclose to the public the serious risks and the potential complications associated with C-QUR Mesh in order to ensure continued and increased sales and profits to the detriment of the public, including Plaintiffs.

164.    Defendants' conduct, acts and omissions, as described herein, are of such character and nature so as to entitle Plaintiffs to an award of punitive damages in accordance with Michigan law.  Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages and punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

Plaintiffs demands judgment against Defendants, and each of them, individually, jointly and severally and pray for the following relief in accordance with applicable law and equity:

i. Compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiffs, permanent impairment, mental pain and suffering, loss of enjoyment of life, past and future health and medical care costs and economic damages including past and future lost earnings and/or earning capacity together with interest and costs as provided by law;

ii. Enhanced Compensatory damages

iii. Reasonable attorneys' fees as provided by law;

iv. The costs of these proceedings, including past a future cost of the suit incurred herein;

v. Prejudgment interest on all damages as is allowed by law;

vi. Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

JAY VANWEZEL AND
PAULA VANWEZEL

Respectfully submitted,

*/s/ Nathan C. VanDerVeer*
Nathan C. VanDerVeer
AL BAR: 7794-A63V
**FARRIS, RILEY & PITT, L.L.P.**
505 20th Street North, Suite 1700
Birmingham, AL 35203
(205) 324-1212 phone
(205) 324-1255 fax
nate@frplegal.com email
*Attorney for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2018, a copy of the foregoing was served electronically and notice of the service of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.

*/s/ Nathan C. VanDerVeer*
Nathan C. VanDerVeer
AL BAR: 7794-A63V
**FARRIS, RILEY & PITT, L.L.P.**
505 20th Street North, Suite 1700
Birmingham, AL 35203
(205) 324-1212 phone
(205) 324-1255 fax
nate@frplegal.com email
*Attorney for the Plaintiff*