# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN RE: | MDL NO. 2753 |
| ATRIUM MEDICAL CORP. C-QUR MESH PRODUCTS LIABILITY LITIGATION | MDL Docket No.1:16-md-02753-LM |
| This document relates to: | |
| *All Cases* | **PLAINTIFF'S POSITION STATEMENT PURSUANT TO THE COURT'S APRIL 30, 2020 ORDER** |

Pursuant to the Court's order on December 17, 2019 (Dkt. No. 1169) as amended by this Court's Order on April 30, 2020 (Dkt. No. 1203), Plaintiffs submit the following Memorandum of Points and Authorities in support of their positions, set forth herein, as to the order and manner of Bellwether Trials.

## I.      SUMMARY OF THE ISSUES

In its December 17, 2019 Order, the Court directed the parties to:

> …attempt to reach agreement on the first case to be tried (between the two cases selected by the parties), the manner of trial (e.g., length of trial), and the timing of the trial of the second case to be tried (which shall be the remaining case of the two cases selected by the parties).

Dkt. No. 1169. The parties have conferred and identified the matters on which they agree as well as the matters which remain in dispute and which are appropriate to be resolved by the Court. The parties are in agreement that several logistical matters related to the manner of trial may be resolved by continuing to meet and confer. These logistical matters include, for example, pretrial exchanges and disclosures, supplemental jury questionnaires, attorney-led voir dire, and the duration of trial. At the Court's indulgence, the parties will continue to confer on these matters in order to reach

informal resolution to the extent possible.  Additionally, the parties agree that the matter of the timing of the second case to be tried should be addressed with the guidance of the Court upon resolution of scheduling issues surrounding the first trial.

Notwithstanding these important areas of agreement, the parties' respective positions differ as to the order of cases to be tried and certain prominent aspects of the manner of trial.  In light of this Court's direction in CMO 3H to select cases which are representative of the cases pending in the MDL, it is the position of the plaintiffs that the first trial case should be *Barron, et al. v. Atrium Medical Corp., et al.* (case no. 1:17-cv-00742).  The plaintiffs in *Barron* take notice of the Court's Order on June 17, 2020 (*Barron*, Dkt No. 104) and consent to a Bench Trial as to all issues beginning on September 29, 2020.  Because Defendants have indicated that they will not be giving corresponding consent, Plaintiffs intend to move the Court for leave to amend the Complaint to bring equitable claims supported by the evidence in the case, including a claim for Unjust Enrichment and a claim pursuant to the New Hampshire Consumer Protection Act, NH Rev Stat § 358-A:1(2015), *et seq.*, thereby permitting the Court to conduct timely trial of Plaintiffs' equitable claims which share a common nucleus of operative facts with Plaintiffs' common law claims.

Further, in light of the procedural posture of the case selected for trial by the Defendants (*Hickinbottom*, case no. 1:17-cv-00713), *Barron* is the obvious and possibly only option for the first case to be tried.  As will be explored in more detail *infra*, the *Hickinbottom* case is currently subject to an unopposed Motion for Summary Judgment.  Selection of the *Hickinbottom* case for the first trial, in the event that the Court grants Defendants' Motion for Summary Judgment, will result in (1) delay of the first trial in this MDL and/or (2) additional modification of the trial schedule to account for *Hickinbottom*'s dismissal.  In the event of such a dismissal, Defendants

take the position that they should be granted license to choose *Hickinbottom*'s replacement as a Trial Pick and propose that that as-yet-unidentified case be the subject of the first trial in this MDL. Such a scenario would have a number of undesirable consequences in that it would: (1) beget additional delay as any replacement case has not yet been the subject of *Daubert* and dispositive motions, (2) reward Defendant's selection of a non-representative Bellwether case, (3) incentivize further flouting of the Court's direction to choose a representative trial case, and (4) frustrate the purposes of the bellwether process as expressed in the *Manual for Complex Litigation, Fourth* and carried out in numerous MDLs.

## II.   **RELEVANT PROCEDURAL HISTORY**

On May 29, 2018, the Court entered Case Management Order 3H, setting the procedures for the selection of Bellwether cases. See Dkt No. 638.

On August 9, 2018, the parties filed the Notice of Initial Discovery Pool Selection. See Dkt. No. 840.  As reflected in the Notice, the parties each selected eight cases which would undergo case-specific discovery, including depositions of plaintiffs and treating physicians.  The respective Discovery Pool selections of the parties are set forth in the attached Exhibit A.

On July 15, 2019, following case-specific discovery in the Discovery Pool cases, the parties selected eight Trial Pool cases. See Correspondence from Mark Cheffo, attached as Exhibit B; see also Correspondence from Jonathan Orent, attached as Exhibit C.

On August 8, 2019, the Court held a status conference. Discussed at this conference was the issue of the potential for dismissal of cases within the Trial Pool and how that would impact the bellwether process. The Court reserved decision on this matter until a later date. Dkt. No. 1121, 11:25-16:25

On September 17, 2019, the plaintiffs in the Trial Pool cases served expert disclosures pursuant to Fed. R. Civ. P. 26.  On May 14 and 15, 2020, the parties exchanged strikes and picks to arrive at the first two cases to be tried.  Plaintiffs struck *Vollmar, Amy*, Case No. 1:17-cv-00704, and Defendants struck *Hicks, Daniel*, Case No. 1:17-cv-0070. On May 15, 2020, the parties selected two cases for the first two trials. Plaintiffs selected *Barron, Carrie*, Case No. 1:17-cv-00742, and Defendants selected *Hickinbottom, Juanita*, Case No. 1:17-cv-00713. See Dkt. No. 1205.

On June 12, 2020, Defendants filed a Motion for Summary Judgment in the *Hickinbottom* case. See Case No. 1:17-cv-00713-LM, Dkt. No.85.  Plaintiff Juanita Hickinbottom did not file a Response in Opposition to the Motion.  Although Dispositive motions do not require a pre-motion conference with opposing counsel, had Defendant sought one, Plaintiff in the *Hickinbottom* case would have advised Defendant that the Motion would not be opposed.

### III.     PLAINTIFFS' POSITIONS REGARDING ORDER OF TRIAL

**a.  The Barron case should be set for trial first because it is representative of the cases in the MDL and will best serve the purposes of the bellwether process and the MDL in general**

This Court's authority to conduct a bellwether trial derives from Rule 42(b), which provides that, "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one more separate issues, [or] claims…" *See In re Hydroxycut Mktg. & Sales Practice Litig.*, 2012 U.S. Dist. LEXIS 93282, *50 (S.D. Cal. June 28, 2012)(quoting Fed.R.Civ.P. 42(b))(internal quotations omitted). The need for bellwether cases to be representative of the broader group of filed cases is endemic to mass tort practice and has been routinely observed by MDL courts engaged in bellwether trial selection.  In an oft-quoted opinion on the matter, the court in a toxic tort MDL explained:

> The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock. The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the mass tort context.
>
> …
>
> If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts.

*In re Chevron U.S.A.*, 109 F.3d 1016, 1019 (5th Cir. 1997).  The court in *Chevron* went on to characterize the information provided by bellwether trials as having a "value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants…" *Id.* While the *Chevron* court emphasized the value – for settlement purposes – of the information yielded by the trial of representative cases, such information is all the more crucial in MDLs where the constituent cases may be remanded to their respective transferor courts for case-specific discovery and trial.[1] Because continued litigation within the MDL and in a multitude of United States District Courts in the context of mass remand would entail significant expenditure of resources of the parties and the courts, the ability of litigants in the MDL to extrapolate from results of a bellwether trial and meaningfully apply that insight to their own cases is central to the purposes of Multi-District Litigation.[2]

In CMO 3H, this Court acknowledged a bellwether's "value ascertainment function" for the purposes both settlement and subsequent trials, advising that:

> The parties are encouraged in making selections for Discovery Pool and Trial

---

[1] The *Chevron* litigation involved injuries from a localized environmental contamination.  Thus, mass remand to venues throughout the country, and the costs attendant thereto, did not enter into the court's calculus.

[2] See Hon. Eldon L. Hallon, *et al.*, Proceedings of The Tulane Law Review Symposium: The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation, 82 Tul. L. Rev. 2323, 2332("The ultimate purpose of holding bellwether trials in [MDL 1355 and MDL 1657] was not to resolve the thousands of related cases pending in either MDL in one "representative" proceeding, but instead to provide meaningful information and experience to everyone involved in the litigations.")

> Pool cases to select cases that will be representative of all filed cases in order that the process of selection and trial will be a helpful process for evaluation of the entire docket of cases for trial and resolution of the entire docket of cases.

Dkt. No. 638 at ¶5.8.

At the Court's direction, Plaintiffs selected a group of cases, including the *Barron* case, which represent both (1) the types of injuries and damages which exemplify those most common among MDL plaintiffs and (2) the products in the C-Qur line which are most common among MDL plaintiffs.[3]

### *Barron* is representative of the MDL docket as to mechanism of injury

While Plaintiffs are loathe to engage in conflicting characterization of the cases on the docket, the record is clear that claims involving the failure modes of mesh infection and/or failure of the mesh to incorporate into the abdominal wall feature prominently among the claims which the parties look to the MDL Court to adjudicate. Indeed, claims involving infection and failed graft incorporation have, from the beginning of the MDL, been a common thread which ties a great many of the constituent claims together and also distinguishes this MDL from others involving surgical mesh. The Plaintiffs' Master Long Form Complaint states, *inter alia*, "[n]o other surgical mesh sold in the United States has the dangerous and defective Omega 3 coating, which itself causes or increases the risks of numerous complications, including the *prevention of incorporation*, increased risk of seroma formation, immunologic response, [and] *increased risk for infection*…." Dkt. No. 53 at ¶122. When the Court oversaw Science Day presentations on October 27, 2017, infection and lack of graft incorporation – as failure modes *specific to the products at issue* – were predominant in Plaintiffs' presentation. See Plaintiff's Science Day Presentation at 63-76.[4] The typicality of these failure modes is also reflected in their inclusion in the Plaintiff Profile Form,

---

[3] See attached Exhibit A
[4] See http://www.nhd.uscourts.gov/pdf/Atrium_Plaintiff_PowerPoint.pdf, last accessed July 7, 2020

the MDL's first-line discovery tool which is the product of negotiation between the parties.  Dkt. No. 377-1 at §V.  It was the typicality of these failure modes throughout the cases in the MDL which led Plaintiffs to select the *Barron* case.  Ms. Barron's case features both the issues of mesh infection and failed graft incorporation.  See Long Form Complaint, *Barron et al. v. Atrium Medical Corp. et al.*, Case No 1:17-cv-00742-LM, Dkt. No. 64, ¶70; see also Exhibit D, Deposition of Dr. Howard Langstein at 202:19-21.  As such, the *Barron* case is representative of the cases in the MDL with regard to injury mechanisms.  Setting the *Barron* case for trial first will serve the "value ascertainment" function of bellwethers by illustrating for the parties and the plaintiffs in the MDL's constituent actions the strengths and weaknesses of the causation evidence underlying these common failure modes alleged by MDL plaintiffs.

        The representative injury profile in the *Barron* case stands in glaring contrast to that of the *Hickinbottom* case, the action proposed by Defendants as the first trial case.[5]  The claimed injury in this case is pain emanating from the fixation of the mesh (*i.e.* sutures).  As Defendants set for in their Motion for Summary Judgment in that case, "Plaintiff has alleged that C-QUR mesh caused her harm consisting of a 'second surgery to remove painful fixation stitches at the edge of the mesh in three different areas.'" (1:17-cv-00713-LM, Dkt. No. 86 (quoting *Hickinbottom* Long Form Complaint at ¶18)).  With regard to this particular injury mechanism, the *Hickinbottom* case fails the representativeness/informativeness test for bellwether cases in two important ways.  First, the number of cases in the MDL where the claimed injury mechanism is limited to fixation-related pain is infinitesimal.  As a result, if such a bellwether trial were to

---

[5]Plaintiffs acknowledge that, given the procedural posture of the *Hickinbottom* case, arguing against its election as the first trial case is largely academic.  Notwithstanding this, Plaintiffs believe that exploration of Defendants' selection will provide the Court with insight into Defendants' apparent strategy *vis-à-vis* the Court's recommendation to choose representative cases and inform the Court's approach for the selection of a case to replace *Hickinbottom*.

take place, it would provide essentially no useful information to other litigants in the MDL whose respective cases implicate one or more of the heavily represented injury modes.  Second, even if there were more than a miniscule number of cases in the MDL where the principal injury is fixation-related pain, trial of such a case would still not yield useful information for other litigants.  There are numerous methods of mesh fixation and numerous different products with which a surgeon can choose to secure a mesh prosthetic, none of which are inextricably linked to the C-Qur line of mesh products or, for that matter, the mesh products sold by other manufacturers.  As a result, the outcome of such a trial would have no significant relationship to the products at issue in this litigation or to the plaintiffs with cases pending therein.  Thus, devoting resources to trying *Hickinbottom* or a similarly non-representative case would do nothing to serve a bellwether's "value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants…" *Chevron*, 109 F.3d at 1019.  In light of this, the *Barron* case is clearly better suited to carry out the aims of the bellwether process and is, thus, the best option to proceed to trial first.

<u>*Barron* is representative of the MDL docket as to the product at issue</u>

As the Court is aware, this MDL is comprised of individual actions stemming from injuries allegedly caused by one of a number of models in the C-Qur line of hernia mesh.  The Short Form Complaint which was approved by the Court and which has been used in every action pending in the MDL references the following particular products: C-QUR Mesh; C-QUR Mosaic; C-QUR Edge; C-QUR TacShield; C-QUR Lite Mesh V-Patch; and C-QUR Mesh V-Patch. See Short Form Complaint at ¶¶10-11.  From the beginning of the MDL, the product with the highest representation in the pool of constituent cases has been the C-Qur V-Patch, the product at issue in the

*Barron* case.  During the Science Day presentations, Defendants provided the following chart to the Court reflecting a breakdown of the pending actions by product.[6]



The C-Qur V-Patch has had the highest representation among cases in the MDL from the start and continues to be the predominant product in the pending actions.  As a result, should the Court designate the *Barron* case for the first trial, it would fulfill the 'value ascertainment function' intended of bellwether trials in that the results can be readily applied to the largest cohort of cases on the docket.

The products at issue in the Trial Picks provide yet another ground on which the Defendants' choice reveals a stark and telling contrast between the parties' respective

---

[6] See Science Day - Defendants' PowerPoint Presentation;
http://www.nhd.uscourts.gov/pdf/Atrium_Defendants_PowerPoint.pdf; last accessed July 5, 2020.

interpretation of the Court's suggestion to choose representative cases.  In addition to the unique injury discussed above, the *Hickinbottom* case involves the C-Qur Mosaic, a product which comprised only 3% of the pending cases, according to the Defendants' own calculations.  Although Defendants may point to a variety of factors (*e.g.* marketing strategy, regulatory factors, etc.) to account for this vast representation disparity, it is far from a distinction without a difference.  Philip McNamara, the Defendants' own Research and Development Engineer explained in his deposition that the C-Qur Mosaic, along with C-Qur FX, has a significant design difference which sets it apart from the group of products which includes the most heavily represented products in the MDL, the C-Qur V-Patch, C-Qur Tacshield and C-Qur Mesh.  When Mr. McNamara was deposed about the similarities and differences among the different models in the C-Qur line of products, he testified as follows:

> A.    When I'm talking about C-QUR mesh, I'm only talking about the product called C-QUR, and not necessarily referring to FX, Mosaic, or the other products.
>
> …
>
> A.    The difference between C-QUR and C-QUR FX is C-QUR is what we call encapsulated, so there is a smooth side and a rough side with coating encapsulating or covering the mesh.
>
> Whereas, C-QUR FX is a lightly coated mesh where there's no smooth side or rough side. The monofilament is just lightly coated with fish oil.
>
> …
>
> Q.    So the V-Patch has an encapsulated mesh component?
>
> A.    Yes, there is.
>
> Q.    Other than V-Patch and C-QUR mesh, do any of the other meshes that you named have a complete encapsulation of the mesh with the fish oil?
>
> A.    Yes. The other product that has encapsulation is C-QUR Tac-Shield.  I'm sorry. Also, C-QUR Edge.

10

McNamara Dep. 35:5–8; 37:10–18; 38:24–39:8; attached as Exhibit E.

When these admissions are viewed in light of the product distribution above, the Defendants' approach to the bellwether process comes into sharp focus. Approximately 95% of the cases pending in the MDL involve a product the design of which features complete encapsulation of the mesh within the fish oil coating. Despite this fact, or more likely because of this fact, Defendants selected a trial case from the remaining 5%, a small minority of cases that share a design element (*i.e.*, fish oil coating that does <u>not</u> encapsulate the mesh) which separates them from the vast majority of the cases in a way that is central to the claims at issue in this MDL.

While both the stated preference of the Court and MDL bellwether trial practice generally aim at results which have broad application across the docket, the Defendants have made their case selection with the apparent intent to assure that the results of any trial have the narrowest application possible. In order to prevent the Defendants' strategies from thwarting the purposes of the bellwether process, the Court should set the *Barron* case as the first trial and, as will be addressed below, oversee the selection of *Hickinbottom*'s replacement to assure that the case is reasonably representative of the cases in the MDL.

## IV.   <u>PLAINTIFFS' POSITIONS REGARDING MANNER OF TRIAL</u>

Plaintiffs Carrie and Nicholas Barron acknowledge the Court's suggestions in the Order dated June 17, 2020 (Case No.1:17-cv-00742-LM; Dkt. No. 104) and consent to a bench trial as to all claims.

This MDL began in 2016 and has, in the intervening years, been the object of an immense investment of time and resources for the parties as well as the Court. Additionally, the number of litigants looking to the MDL for resolution of their claims has grown from the 28 member actions at the time of the first in-person status conference to the approximately 2,200

actions pending before the Court today. See Dkt. No. 46 at 5: 12-14.  The parties have conducted – and nearly completed – discovery on all of the issues necessary for adjudication of the essential claims of MDL litigants, as well as years of discovery on the issue of personal jurisdiction. There are Plaintiffs in this MDL who have died during the pendency of their respective actions. See, *e.g.*, Dkt. No. 1105.  In short, the MDL has accomplished a great deal since its inception, and it is now ripe for the first trial.  However, as the Court observed in the June 17 Order, the COVID-19 outbreak has presented unique and significant challenges with regard to adjudication of cases by jury trial.  While a jury trial is the traditional terminus of a bellwether case, and courts throughout the country are employing a number of different protocols for the continuation of court business, Plaintiffs agree that there is currently no reliable way to forecast when it will be possible to conduct a jury trial in a manner that doesn't pose an unreasonable risk to jurors, witnesses, counsel, and the Court.[7]  Rather than permit the trial cases to wither on the vine and forestall resolution of the claims of the rest of the MDL, Plaintiffs would accept the Court's proposal to conduct a bench trial of Plaintiff *Barron*'s claims.

The Court has identified certain scenarios in which a bench trial may be carried out:

- where the parties agree that the whole case (i.e. all remaining claims and issues) may be tried before the court; or

- where the parties agree that one or more claims can be bifurcated and tried before the court, such as where the parties lack a right to a jury trial on one claim or claims (e.g. a claim under the New Hampshire Consumer Protection Act); or

- where the parties agree that there are one or more factual issues that the court could resolve that may help progress the litigation, narrow the issues for trial, or advance the case towards settlement.

---

[7] While Plaintiff Barron grants consent to a bench trial under the present circumstances, Plaintiffs recognize that research is underway on a large scale, and new ways to conduct trials are being tested throughout the country.  In light of this, Plaintiffs are not waiving the right to a jury trial indefinitely.  Nor does Plaintiff Barron's qualified waiver extend to all MDL litigants, but Plaintiffs reserve the right to jury trial as soon as a feasible method is available.

Case 1:17-cv-00742-LM Dkt. No. 104.

As referenced above, Defendants do not consent to try the Trial Picks by bench trial.  As a result, Plaintiffs in *Barron* intend to seek leave from the Court to add claims under the New Hampshire Consumer Protection Act and under the equitable theory of unjust enrichment.  If Defendants oppose such a motion for leave, Plaintiffs believes it is worthy to note that Plaintiffs in *Barron* brought both claims in the Short Form Complaint. See Case No. 1:17-cv-00742-LM, Dkt. No. 1 at ¶19.  If the Court grants leave to amend to re-institute these claims, the *Barron* Plaintiffs would seek to bifurcate these claims so that they may be tried by the Court.  The contemplated trial would represent significant progress and would be valuable to the MDL at large because trial of the referenced statutory and equitable claims would implicate much of the same underlying Defendant conduct as the common law claims.  Additionally, proof of the New Hampshire Consumer Protection Act claim would entail the introduction and evaluation by the fact-finder of the general and specific causation evidence at issue in this case.

## V.      PLAINTIFFS' POSITIONS REGARDING REPLACEMENT OF *HICKINBOTTOM* CASE

As indicated in the Joint Agenda for the July 9 Status Conference filed by the parties (Dkt. No. 1210) and discussed briefly above, the *Hickinbottom* case is subject to a Motion for Summary Judgment to which no Response in Opposition has been filed.  Given the deadlines set for the Trial Picks and the issues currently before the Court, the procedure for selecting a replacement for *Hickinbottom* is a matter of some urgency.  Plaintiffs believe it would be beneficial to first obtain the Court's direction as to the desired scope of briefing of this issue but will provide an outline and preliminary position on the issue herein.

This is not the first time the Court has considered the procedures for replacing a case which has been dismissed after being selected for bellwether workup.  On August 8, 2019, the Court addressed the issue of potential substitution of cases in light of the pending Motions to Dismiss under Fed. R. Civ. P 12(b)(6) in the Trial Pool cases. See Dkt. No. 1121 at 11:18-12:19. Following selection into the Initial Discovery Pool, the *Van Wezel* case (1:17-cv-00439) and the *Smith* case (1:17-cv-710) were voluntarily dismissed, and Defendants chose the replacement cases.  The Defendants replaced the *Van Wezel* case with that of Theresa Short (No. 17-cv-00630) and replaced the *Smith* case with that of Michael Petersen (No. 18-cv-00212).  Both replacement cases are atypical of the MDL docket in that the plaintiffs have <u>not</u> undergone surgical excision of the C-Qur mesh. See *Short*, Case No. 17-cv-00630, Dkt. No.1 at ¶13; *Petersen*, Case No. 18-cv-00212, Dkt. No. 55 at ¶¶ 68-70.  Plaintiffs' internal evaluation of the docket indicates that approximately 95% of the cases in the MDL involve at least one excision surgery.

Due to the non-representative nature of Defendants' replacement selections, at the August 8, 2019 status conference, Plaintiffs' Lead Counsel expressed Plaintiffs' opposition to permitting Defendants to select replacements for bellwether cases which are dismissed on motion practice. In so doing, lead Counsel presaged the situation which the *Hickinbottom* case presents:

> Mr. Orent:
> …[W]hat [Plaintiffs] sought was parity. Each side selected four cases. And the idea was to understand what would drive resolution in these cases.  That -- and by a dismissal, that gives the defendants their piece of information that they need.  It would reward defendants' selection to put forward cases that -- that they know that they can win on motion practice who they're not intending on taking to trial, to put those cases up so that they could then just move the next four up.

Dkt. No. 1121, 13:24-14:9.  As discussed above, the *Hickinbottom* case which Defendants selected into the Initial Discovery Pool is uniquely non-representative of the MDL docket.  Further, the fact that the *Hickinbottom* case entailed a relatively rare product and an atypical injury was known to Defendants at the time the case was filed, long before its Discovery Pool selection.

As if this weren't enough of a subversion of the bellwether process, Defendants' selection of *Hickinbottom* as a Trial Pick occurred *well after* the plaintiff in that case made her Rule 26 expert disclosures which named no case-specific causation expert.  In particular, Defendant knew as of the September 17, 2019 deadline for Rule 26 disclosures that the *Hickinbottom* case lacked evidence of specific causation, a fact which they characterized as "fatal to each of her claims." See Case No. 1:17-cv-00713-LM, Dkt. No. 86 at p. 9.

At any point following that disclosure, Defendants could have moved for Summary Judgment and removed a case which they believed would provide no trial result from the bellwether process.  However, it is evident that a timely dispositive motion would not be consistent with Defendants' bellwether selection strategy.  Instead, Defendants lay in wait for nearly eight months without conferring with counsel for the plaintiff before finally nominating *Hickinbottom* to be the first bellwether trial case.  In so doing, and in light of the Court's suggestion regarding trial selections, Defendants proffered *Hickinbottom* – a case they expected to be dismissed on motion practice – as the proverbial wether meant to reliably lead the 'flock' of the MDL by yielding broadly applicable results, informing settlement discussions, and providing trial materials which can be used by plaintiffs whose cases are later set for trial.

Plaintiffs believe it is clear that Defendants' bellwether case selections thus far do not reflect an earnest intention to aid the purposes of the bellwether process as expressed in *Chevron*

and the *Manual for Complex Litigation, Fourth,* §22.315.  Nor can it be expected that permitting Defendants to choose a trial replacement for *Hickinbottom* will yield a different result this time. In the interest of safeguarding the time and resources of the Court as well as those of the parties, Plaintiffs suggest that the Court oversee the selection of the case to replace *Hickinbottom*, taking into account the relevant indicia of representativeness as well as factors which bear on a case's likelihood of informing resolution discussions and/or providing useful information for those cases with subsequent trial settings.

## VI.   <u>CONCLUSION</u>

This MDL has been pending for several years and is the object of a great deal of investment of time, labor, and resources for the parties and the Court.  As the litigation with the first trial setting among numerous State and Federal coordinations of hernia mesh cases, the results of the bellwether process will not only have profound affects upon the rights of the plaintiffs in the member cases, but  also ripple far beyond the temporal and subject-matter boundaries of this MDL.  In order to fulfill the well-recognized purposes of the bellwether process as well as the Court's stated commitment to provide justice effectively and efficiently, the Court should set the *Barron* case for the first trial and engage the parties on the topic of adjudicating the case by bench trial.  In order to prevent further waste of time and resources, the Court should engage with the parties on a procedure for the selection of a replacement Trial Pick which meaningfully incorporates factors which make such a case representative of the MDL docket and likely to provide value to the litigants by virtue of its result.

Dated: July 8, 2020

                                        Respectfully submitted,

                                        /s/ Jonathan D. Orent, Esq._____
                                        Jonathan D. Orent
                                        **Motley Rice LLC**
                                        55 Cedar Street, Suite 100
                                        Providence, RI 02903
                                        (401)457-7723
                                        (401)457-7708 (fax)
                                        jorent@motleyrice.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 8th day of July 2020, I electronically transmitted the foregoing

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

Electronic Filing to all counsel of record.

                                        /s/ Jonathan D. Orent, Esq.____