**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **IN RE:** | **MDL NO. 2753** |
| **ATRIUM MEDICAL CORP. C-QUR MESH PRODUCTS LIABILITY LITIGATION** | **MDL Docket No. 1:16-md-02753-LM ALL CASES** |

<u>**REPORT AND RECOMMENDATION OF SPECIAL MASTER ELLEN REISMAN REGARDING AWARD OF COMMON BENEFIT ATTORNEYS' FEES**</u>

**I.     Introduction and Summary of Conclusions**

On May 15, 2017, this Court entered Case Management Order ("CMO") No. 4 which, *inter alia*, established a Common Benefit Fee Fund and a Common Benefit Expense Fund (the "Funds"), set forth rules governing payments into and disbursements from those Funds, and defined common benefit work that would be eligible for fee awards.  (Doc. no. 64).  On April 26, 2022, the Court entered an Endorsed Order granting the Plaintiffs' Executive Committee's ("PEC") motion to establish holdback percentages from the Gross Monetary Recovery of 10% for common benefit attorneys' fees and 2% for common benefit expenses.  (Doc. no. 1324).

On August 2, 2023, I submitted my Report and Recommendation Regarding Reimbursement of Common Benefit Assessments and Expenses.  (Doc. no. 1354).  No objections were filed, and the Court adopted my Report and Recommendation by Endorsed Order on September 7, 2023.  When I submitted my August 2 Report and Recommendation, my evaluation of firms' Common Benefit Applications as related to fees was ongoing.  I have now completed that

1

work and submit this Report and Recommendation Regarding Award of Common Benefit Attorneys' Fees.

As of the date of this filing, review of the claims of 2,928 claimants in the settlement are complete, all extraordinary injury hearings for those claimants have been conducted and all have been notified of their final allocations.  A total of 1,937 claimants have been on payment lists that have been approved by Motley Rice, Epiq Global, and me (as required by the Master Settlement Agreement).[1]   Given that the administration of the settlement is nearing completion, it is appropriate to address common benefit fee awards for those lawyers whose work resulted in the creation of the settlement fund.

After my review of fifteen firms' submissions of data relating to their claimed common benefit hours and fourteen firms' Applications describing the work that they did,[2] I have approved approximately 34,000 hours as appropriately compensable common benefit time consistent with this Court's CMO No. 4.  Lead Counsel has confirmed that a total of $15,848,727.36 is available from which to award common benefit fees and this Report and Recommendation recommends fee disbursements of $14,485,000.[3]  As described below, the firms seeking common benefit awards performed a significant volume of work, resulting in a successful global settlement in a multidistrict litigation that presented challenging legal and scientific issues.

---

[1] Generally speaking, claimants who have not yet been authorized for payment are still working through the lien reconciliation process or completing other requirements of the MSA.

[2] Cory Watson Attorneys submitted a time sheet of claimed common benefit hours and was invited to submit a written Application but did not do so.

[3] The total amount available for common benefit fees ($15,848,727.36) must be reduced by $100,119.69 to account for approved common benefit assessments and expenses in excess of the amount set aside for reimbursement of those assessments and expenses.  In addition, as discussed below, I recommend holding back $1,263,607.67 for future awards, as common benefit work is ongoing and expenses continue to be accrued, primarily for implementation of the  settlement.

Based on my review of the hours data, Common Benefit Applications submitted, and my (sometimes multiple) conversations and correspondence with applicant firms, on November 6, 2023, I circulated to all affected law firms a confidential proposal for an allocation of fees. I requested that any firm objecting to this proposal notify me by the end of the day on Wednesday, November 8th. I either received emails of approval or no response from fourteen of fifteen firms. Only one firm responded that it was considering an objection. Accordingly, my recommended allocation of common benefit fees set forth in this Report and Recommendation is one that has been accepted by all but one affected firm. It is my recommendation that the Court order that common benefit attorneys' fees be awarded to each law firm according to the allocation provided herein.

## II.  Legal Standard for Common Benefit Awards

The common benefit doctrine "permits the creation of a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries."[4] The common benefit doctrine has its roots in a court's equitable powers, *quantum meruit,* and inherent authority to manage complex litigation.[5] The available caselaw is consistent that, when allocating a common fund among

---

[4] *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 769 (E.D. La. 2011) (citing *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring)). *See also In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995) (noting common fund cases are "cases in which 'a litigant or lawyer who recovers a common fund for benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'") (quoting *Boeing Co. v. Van* Gemert, 444 U.S. 472, 478 (1980)); Manual for Complex Litigation (Fourth) § 14.11 (2004).

[5] *See In re Vioxx*, 802 F. Supp. 2d at 769-770 ("[A] court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work.") (citing *In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977)); Manual for Complex Litigation (Fourth) § 14.121 (2004) ("The common-fund exception to the American Rule is grounded in the equitable powers of the

counsel, such allocations should reflect each attorney or firm's "relative contribution" to the outcome of the litigation.[6]

 In the First Circuit, district courts determining a common benefit fee award have discretion to use the percentage of the fund ("POF") method, the lodestar method, or some combination of the two.[7]  That said, the POF method is the "prevailing praxis" and has distinct advantages over the lodestar method.[8]  "[W]hether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances.  What constitutes a reasonable fee is properly committed to the sound discretion of the district court."[9]

---

courts under the doctrines of *quantum meruit* and unjust enrichment.").  *See also Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 921 (N.D. Ohio 2003).

[6] *See In re Thirteen Appeals*, 56 F.3d at 308 (holding lower court did not err in utilizing POF method to allocate fees, "emphasizing the attorneys' 'relative contribution' to the creation of the Fund."); *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d at 923 (noting that using POF method with lodestar cross check "helped the Court to enter fee awards that reflect accurately the common benefit each applicant conferred upon the plaintiff class *relative to each other applicant*…." (emphasis in original)); *In re Diet Drugs*, No. Civ.A. 99-20593, 2003 U.S. Dist. LEXIS 9841, at *6 (E.D. Pa. May 15, 2003) ("The Committee's overarching consideration in allocating the interim fee award was the relative contribution of each MDL 1203 Firm to the overall outcome of the litigation."); *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 812 (E.D. La. 2008) ("This apportionment is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other counsel.").

[7] *In re Thirteen Appeals*, 56 F.3d at 307 ("We hold that in a common fund case the district court, in the exercise of informed discretion, may calculate counsel fees either on a percentage of the fund basis or by fashioning a lodestar.").

[8] *See id.* (noting that the POF method is less burdensome to administer, does not create a monetary incentive toward inefficiency or delayed settlement, and is more results-oriented than process-oriented); *see also In re Lupron Mktg. & Sales Practices Litig.*, No. MDL 1430, 01–CV–10861, 2005 U.S. Dist. LEXIS 17456, at *10-11 (D. Mass. Aug. 17, 2005) (noting the "distinct advantages" of the POF method); *Wright v. S.N.H. Univ.*, 561 F. Supp. 3d 211, 214 (D.N.H. 2021).

[9] *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (internal citations omitted).

District courts in the First Circuit have "'extremely broad' latitude to determine an appropriate fee award under the POF method" and are "not require[d] . . . to examine a fixed laundry list of factors."[10]  Having reviewed the kinds of factors typically considered in common fund cases,[11] I believe the following commonly considered factors have relevance to this case:

- Time and labor expended by counsel;

- Magnitude and complexities of the litigation;

- Duration of the litigation;

- Risks of litigation and recovery; and

- Quality, skill, and experience of counsel.

Consideration of these factors is not a mechanical process and there is no specific weight to be given to one factor over others.[12]  While time and hours expended is certainly a factor, total hours per firm is and should not be solely determinative of a firm's award.[13]  "[I]t is universally

---

[10] *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249, 265-66 (D.N.H. 2007); *In re Lupron Mktg. & Sales Practices Litig.*, 2005 U.S. Dist. LEXIS 17456, at *12 (noting that "the First Circuit does not mandate the weighing of any specific set of factors in assessing a common fund fee request").

[11] While different circuits have different approaches regarding what specific factors must be considered and how they are applied when allocating fee awards, there is significant commonality regarding what factors courts deem relevant, including, *inter alia*, the time and labor required of counsel, the magnitude and length of the litigation, the novelty and complexity of the litigation, the skill, experience, and reputation of counsel, the quality and efficiency of counsel, and the risk of nonrecovery.  *See e.g.*, *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (some permutation of the *Johnson* factors are used by the Fourth, Fifth, Eighth, Tenth, and Eleventh Circuits); *Goldberger v. Integrated Res., Inc.*, 2019 F.3d at 50 (listing factors utilized by the Second Circuit); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (identifying factors utilized in the Third Circuit).

[12] *See In re Lupron Mktg. & Sales practices Litig.*, 2005 U.S. Dist. LEXIS 17456 at *12; *see also In re Diet Drugs*, 582 F.3d 524, 545 (3d Cir. 2009) ("The fee award reasonableness factors 'need not be applied in a formulaic way' because each case is different.") (citations omitted).

[13] Judge Fallon has explained, "Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics . . . , drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of

recognized that when it comes to the allocation of common benefit funds, 'not all types of work are created equal.'"[14]

### III.    Special Master's Approach, Review Process, and Review Criteria

Relevant background regarding this litigation and important developments and milestones of the litigation were outlined in my Report and Recommendation Regarding Reimbursement of Common Benefit Assessments and Expenses. (Doc. no. 1354 at 4-8).  In addition, Section III of the PEC's Memorandum in Support of Motion to Establish Holdback Percentage for Common Benefit Fees and Expenses Pursuant to Case Management Order No. 4 provides helpful context and detail regarding the significant amount of work Plaintiffs' counsel performed in this litigation. (Doc. no. 1324-1 at 5-6).

Case Management Order No. 4 set forth that work could be eligible for reimbursement as common benefit work if it was "(a) for the common benefit; (b) appropriately authorized; (c) timely submitted; and (d) verified by a partner or shareholder in the submitting firm."[15]  The Order also listed several non-exhaustive examples of common benefit work: "maintenance and working in the depository; review and document coding; expert retention and development . . . ; preparing for and conducting authorized depositions of Defendants, third-party witnesses, and experts; and activities associated with preparation for trial and the trial of any cases designated as 'common

---

the case are some of the more significant types of work that a case of this sort requires and deserves the most recognition.  This, of course, is not the only type of work that such a case requires. Documents must be reviewed, categorized, and analyzed; e-mails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored.  This work, while necessary and often time consuming, does not deserve equal treatment when allotting fees."  *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d at 810-811.

[14] *In re Benicar (Olmesartan) Prods. Liab. Litig.*, No., 1:15-md-02606, 2019 U.S. Dist. LEXIS 191936, at *18 (D.N.J. Nov. 5, 2019) (citations omitted).

[15] CMO 4, III.A.

benefit trials' . . . ."[16]  Further specification and limitations regarding what work could constitute compensable common benefit work were set forth in Section IV.C.1 of the Participation Agreement.  (Doc. no. 64-1).  I have familiarized myself with these provisions and relevant caselaw, and they have informed my review of the submitted common benefit time.

Fourteen firms submitted Common Benefit Applications seeking common benefit fee awards: Bailey & Glasser, LLP; Brenes Law Group, P.C.; CR Legal Team, LLP; Dickerson Oxton, LLC; Fleming, Nolen & Jez L.L.P.; Hollis Law Firm PA; Holman Schiavone, LLC; Levin Papantonio Rafferty Proctor Buchanan O'Brien Barr Mougey P.A. (hereinafter "Levin Papantonio Rafferty"); Motley Rice LLC; Taylor Martino Rowan; The Gori Law Firm; Upton & Hatfield, LLP; Wagstaff Law Firm; and Wright & Schulte, LLC.[17]  These firms claimed approximately 35,700 hours of common benefit time.

I have undertaken a review of each firm's submitted hours and consulted with the firms and the PEC concerning them.  I have eliminated duplicate entries, confirmed that the hours submitted were incurred in connection with work on the Atrium C-Qur litigation and were for the common benefit, and determined that the hours were reasonable and necessary for this litigation and consistent with the provisions of CMO 4 and the Participation Agreement.  Once my review was complete, I approved approximately 34,000 common benefit hours.  As a general matter, my review and analysis of firms' time entries indicated that Plaintiffs' leadership were able to secure a very favorable result for the common benefit of all plaintiffs in an efficient manner.

In making my recommendations as to fee awards, and consistent with caselaw, my evaluation was a qualitative analysis, not driven solely by hours worked.  Taking into account the

---

[16] CMO 4, III.B.

[17] As previously noted, Cory Watson Attorneys submitted a time sheet of claimed common benefit hours but not a written Application.

7

information I received from the Applications, from consulting with leadership, and from conversations with the applicant firms, I considered the following factors in crafting my recommendation for fee awards (in no particular order):

1. Which attorneys made significant, substantive contributions at key points in the litigation – *e.g.*, jurisdictional mini-trial, bellwether, settlement negotiations;

2. Who consistently appeared in Court, taking an active role in arguing and negotiating key issues;

3. Whether the firm stayed involved throughout the litigation and committed resources to it, including paying assessments as requested by leadership;

4. Who took key depositions or argued key motions;

5. The level of experience of the attorneys at the firm performing work;

6. The number of hours submitted by each firm and what percentage of the hours submitted were for differing tasks (*e.g.*, assigned document review vs. in-court advocacy);

7. The fact that many of the lawyers involved in this matter were experienced mass tort attorneys who took on this work with no certainty of recovery;

8. Which attorneys were recognized by their peers for taking on organizational or leadership roles in developing the factual, scientific, or legal issues; and

9. The fact that this litigation proceeded on an aggressive schedule, even during a global pandemic.

Considering these factors, I prepared an initial allocation of common benefit fees among the applicable firms. I then communicated individually with the relevant attorneys at each firm to discuss my proposed allocation for that firm. On some occasions, I had multiple calls with a

particular firm.  On November 6, 2023, I circulated by email my proposed allocation of common benefit fees to all affected firms and asked that they inform me by the end of the day on November 8th if they objected to this proposal.  I informed them in my original email that if they did not communicate an objection to me, I would assume they had none.  I received either an email approving my proposed allocation or no response from fourteen of the fifteen affected firms.  One firm communicated that it was considering an objection to my proposal.

## IV.    Recommendation Regarding Fees

The Court's April 26, 2022, Endorsed Order set a holdback of 10% of a claimant's Gross Monetary Recovery to be withheld to compensate counsel who performed work for the common benefit.  Lead Counsel has informed me that $15,748,607.67 is available for compensating counsel for their contributions to the common benefit of all MDL plaintiffs.[18]  Because some firms are continuing to perform common benefit work and incur common benefit expenses (*e.g.*, settlement administration work, ongoing litigation work, docket clean-up, and negotiating possible resolution of the remaining MDL claims), I recommend that $1,263,607.67 be held in reserve for a later distribution.  At this time, I recommend disbursement of $14,485,000.00 for common benefit fees in accordance with the following table:

---

[18] The amount available for common benefit fee awards is after deduction of $100,119.69 to account for approved common benefit assessments and expenses in excess of the amount that was available for reimbursement of assessments and expenses.

| Firm | Total Fee Award |
|------|-----------------|
| Bailey & Glasser, LLP | $5,100,000.00 |
| Brenes Law Group, P.C. | $325,000.00 |
| CR Legal Team, LLP | $425,000.00 |
| Cory Watson Attorneys | $5,000.00 |
| Dickerson Oxton, LLC | $5,000.00 |
| Fleming, Nolen & Jez L.L.P. | $100,000.00 |
| Hollis Law Firm PA | $350,000.00 |
| Holman Schiavone, LLC | $1,300,000.00 |
| Levin Papantonio Rafferty | $75,000.00 |
| Motley Rice LLC | $5,750,000.00 |
| Taylor Martino Rowan | $5,000.00 |
| The Gori Law Firm | $400,000.00 |
| Upton & Hatfield, LLP | $225,000.00 |
| Wagstaff Law Firm | $20,000.00 |
| Wright & Schulte, LLC | $400,000.00 |
| **Total** | $14,485,000.00 |

Described below are brief summaries of my considerations in coming to a fee award recommendation for each firm:

a.        **Motley Rice LLC and Bailey & Glasser, LLP**

It is fair to say that a common fund would not exist without the tireless work and experienced stewardship of Motley Rice and Bailey & Glasser.

i.        <u>Motley Rice LLC</u>

Motley Rice, with Jonathan Orent appointed Lead Counsel, shepherded this litigation in a professional, efficient, and effective manner, resulting in a successful global settlement for

Plaintiffs.  The firm worked approximately 9,560 hours over the course of the litigation.  It also invested heavily in the litigation, contributing over $600,000 in assessments and over $630,000 in held costs, with no guarantee of return.  As Lead Counsel, Mr. Orent was involved in every aspect of the litigation, from setting a strong MDL foundation drafting initial pleadings and negotiating early discovery protocols, to high level MDL management and strategy, litigating individual bellwether cases, and ensuring the successful administration of the global settlement.  Mr. Orent was responsible for organizing the PEC and Plaintiffs' Steering Committee ("PSC"), determining what work needed to be performed, who should perform it, and keeping involved attorneys apprised as to litigation developments and upcoming work.

The day-to-day management of an MDL is a full-time role in itself but Mr. Orent, backed by a team of experienced and highly qualified attorneys and staff, also took on much of the actual litigation of the case.  Mr. Orent took a lead role in preparing for and taking the depositions of several critical corporate witnesses, including Atrium President Chad Carlton and Getinge 30(b)(6) witness Peter Hjalmarson.  Motley Rice attorneys also took the lead in locating, retaining, and defending Plaintiffs' general experts and specific causation experts for the bellwether cases.  Mr. Orent was the face of Plaintiffs' leadership for the Court and attended all status conferences, prepared for and presented at Science Day, and co-chaired the trial team for the jurisdictional mini-trial.

Mr. Orent and Motley Rice attorneys also organized, coordinated strategies, and actively litigated the bellwether cases, in particular, taking the laboring oar in researching, drafting, and arguing all motions for lead bellwether case, *Barron v. Atrium*, 1:17-cv-00742.  This work involved drafting and arguing five *Daubert* motions and seven motions *in limine* and opposing Defendants' *Daubert* motions, motions *in limine*, and Motion for Summary Judgment.  These efforts were only

made more complicated by the fact that this work was occurring during the global COVID-19 pandemic and the parties were preparing for what would have been a virtual trial.  Plaintiffs' preparation and flexibility in pushing forward the *Barron* case even during a pandemic helped facilitate productive settlement discussions, led by Motley Rice attorney Fred Thompson.  Even after settlement was reached, Motley Rice attorneys and staff have been instrumental in administering the settlement in an efficient and transparent manner as demonstrated by the fact that the participation rate for the settlement is over 97% and, less than two years from signing, already over 1,930 claimants have been authorized for at least partial payment of settlement funds.

In recognition of Mr. Orent and Motley Rice's dedication, investment, and tireless effort, I recommend a fee award of $5,750,000.00.

ii.   <u>Bailey & Glasser, LLP</u>

Bailey & Glasser attorneys and staff were central to this litigation from start to finish.  They were involved in all aspects of the litigation, including MDL management, litigation strategy, discovery management, corporate depositions, jurisdictional discovery and mini-trial, and bellwether selection and workup.  David Selby was a critical member of the PEC and his firm marshaled significant resources to ensure the success of the litigation, contributing $400,000 in assessments and nearly $163,000 in held costs, second only to Motley Rice.  The firm also contributed the greatest number of hours (nearly 11,000) with four partners and one associate each contributing over 1,200 hours to the litigation.

As a PEC member, Mr. Selby was heavily involved in MDL establishment, management, and organization, including drafting the Common Benefit Order and establishing the processes for time and expense submission.  Mr. Selby actively participated in meet-and-confer meetings to develop the scope and protocol for 30(b)(6) deponents.  In addition, he prepared for and took the

12

depositions of at least five corporate witnesses whose testimony was necessary to help establish Plaintiffs' liability story.  Kate Charonko wielded her considerable experience and expertise with ESI to assist with organizing the offensive document discovery process, including developing document review strategies and protocols, managing document review assignments and operations, and review and analysis of privilege logs.  That foundational work resulted in several White Papers used for identifying important deponents and preparing for their depositions. Bailey & Glasser attorneys were engaged in the briefing of various motions related to discovery disputes including several motions to compel production from Defendants.

Bailey & Glasser attorneys also substantially contributed to Plaintiffs' efforts to establish the Court's jurisdiction over defendant Getinge AB.  Firm attorneys drafted motions to compel production of documents relevant to ascertaining the nature of the relationship between Getinge AB and the other Defendants.  Brian Glasser questioned witnesses whose testimony was central to the issue of jurisdiction over Getinge AB, and the firm drafted motions to strike the testimony of defense experts.  Mr. Glasser and Ms. Charonko co-chaired the trial team three-day jurisdictional mini-trial which was critical to securing a needed financial backstop to make possible the eventual settlement of all plaintiffs' claims.  Mr. Glasser conducted the examination of Plaintiffs' expert witness and cross-examined the defense expert witnesses.  After trial, Bailey & Glasser attorneys participated in drafting post-hearing motions and briefs and helped negotiate resolution of the jurisdictional dispute without ruling from the Court.

Bailey & Glasser remained invested and actively involved during the bellwether process. The firm took a leading role in developing criteria for and selecting bellwether cases and developed deposition outlines for bellwether depositions.  Attorneys from the firm stepped in to help prepare

for and defend plaintiff depositions and the depositions of implanting and explanting surgeons, even for plaintiffs who were not originally clients of the firm.

It is difficult to overstate Bailey & Glasser's contributions to the success of this litigation and nearly impossible to catalogue all the ways in which the firm's attorneys were involved in the litigation.  In recognition of Bailey & Glasser's indispensable work, I recommend a fee award of $5,100,000.00.

### b.    Plaintiffs' Executive Committee Firms

#### i.    Holman Schiavone, LLC

Outside of Motley Rice and Bailey & Glasser, the contributions of PEC member Anne Schiavone of Holman Schiavone were the most significant to this litigation and she was an integral part of the litigation's success.  Lead Counsel relied heavily on Ms. Schiavone to assume a variety of significant responsibilities at every stage of the litigation.  She took seven corporate witness depositions and prepared for and attended four others.  She provided high-level support in preparation for the jurisdictional mini-trial, including drafting and serving discovery and compiling supporting documents for the examination of Atrium's CEO at the mini-trial.  That mini-trial proved to be a driving factor in achieving a global settlement.  During the litigation, Ms. Schiavone also coordinated with opposing counsel on a range of discovery matters, participated in bellwether case selection, discovery, and trial preparation.

Ms. Schiavone's commitment to this litigation was laudable: she worked nearly 3,000 hours for the common benefit, nearly 80% of her time, despite personally representing only one individual plaintiff.  As such, her work on this litigation truly was for the common benefit and she took a significant risk by limiting her firm's capacity to take on other clients and projects with no guarantee of financial success.  For her efforts, I recommend an award of $1,300,000.00.

ii.    <u>The Gori Law Firm</u>

Todd Mathews,[19] in his role on the PEC, has been key to the organization of the litigation as a whole and was involved in the major strategic decisions and direction of this litigation.  In order to provide the resources needed for this litigation, Gori Law Firm hired an associate, Andrew Mossman, specifically to assist Mr. Mathews with the work required by this MDL.  Together, Mr. Mathews and Mr. Mossman worked approximately 3,200 hours for the common benefit.  Mr. Mossman spent significant time performing document review, which served as the basis for several White Papers that were used for the depositions of multiple corporate witnesses.  Mr. Mathews' team also assisted with motions practice, including motions to compel to obtain complete discovery, and oppositions to motions to dismiss certain bellwether cases.  However, the firm's most significant contribution to the litigation was Mr. Mathews' organization and leadership, focused on the development and progress of the litigation as a whole.  As a core member of the leadership team, Mr. Mathews was involved in nearly every aspect of the strategic direction of the litigation.  He spent considerable time preparing for and participating in leadership meetings, court conferences and hearings, including Science Day and the jurisdictional mini-trial, and settlement meetings.  In recognition of Mr. Mathews and his team, I recommend an award of $400,000.00.

iii.    <u>Brenes Law Group, P.C., Hollis Law Firm PA, and Dickerson Oxton, LLC</u>

Adam Evans was appointed to the PEC and was actively involved in the litigation from start to finish.  Mr. Evans was at Hollis Law Firm at the start of the MDL through May 2019, at

---

[19] Mr. Mathews left The Gori Law Firm in September 2021 and joined Bailey Glasser.  Common benefit work performed while Mr. Mathews was at Gori Law Firm is attributed to Gori Law Firm and common benefit work performed while at Bailey Glasser is attributed to Bailey Glasser.

which point he joined Brenes Law Group and continued his work on the MDL.  In May 2022, Mr. Evans joined Dickerson Oxton.  As such, it is appropriate to address these firms together.[20]

### 1.  Hollis Law Firm PA

Attorneys and staff at Hollis Law Firm worked approximately 1,460 collective hours for the common benefit, about 410 of which were work by Mr. Evans.  As part of the PEC, Mr. Evans assisted with many of the foundational, organizational tasks to help the MDL get up and running, including review and negotiation of a defense profile form and defense fact sheet and related orders.  Mr. Evans also worked to help develop the science and medicine underlying the case, taking on the time-consuming tasks of searching for, reviewing, and analyzing relevant medical literature.  He then curated the medical literature cited in general and bellwether expert reports.  Mr. Evans participated in identifying, selecting, and retaining MDL experts.  Finally, as detailed below, Mr. Evans was  involved in expert work for the bellwether cases, work that began when he was at Hollis Law Firm and continued when he moved to Brenes Law Group.

Mr. Evans was not the only attorney from Hollis to provide a significant contribution to the litigation.  Brett Vaughn worked approximately 465 hours for the common benefit, approximately 1/3 of the total Hollis Law Firm hours.  Mr. Vaughn provided valuable assistance to Mr. Evans with regard to preparation for Science Day, conducting targeted document review to help frame Plaintiffs' liability story, and performing research for a deep understanding of the science and medicine involved in the litigation.  Mr. Vaughn's foundational document work helped underpin several White Papers relevant to scientific issues and important corporate deponents.

---

[20] Just as Mr. Mathews' common benefit work spanned multiple firms and was attributed to the firm he was with at the time the work was performed, so too is Mr. Evans' common benefit work. That is, common benefit work Mr. Evans performed is attributed to the firm he was with when the work was performed.

Based on the contributions of Hollis Law Firm, I recommend an award of $350,000.00 for fees.

### 2.   Brenes Law Group, P.C.

Brenes Law Group worked approximately 965 common benefit hours for the litigation, the vast majority of which (over 85%) were the work of Mr. Evans as he continued in his PEC role. While at Brenes Law Group, Mr. Evans' work focused on the bellwether cases, both in preparing his own clients' cases for trial but also coordinating and assisting other firms with their bellwether cases.  Mr. Evans prepared several plaintiffs for depositions and participated in defending those depositions.  In addition, he took the depositions of several treating physician fact witnesses.  Mr. Evans also spent time on expert and science issues, preparing a template report for bellwether cases, working with and preparing several of Plaintiffs' case-specific experts for deposition and defending those depositions, and taking the depositions of two defense case-specific experts. Following on that deposition work, Mr. Evans assisted with drafting *Daubert* motions and responses to Defense *Daubert* motions.  Once settlement was reached, Mr. Evans assisted in creating an allocation framework for the settlement.  Beyond Mr. Evans' contributions, Troy Brenes prepared for and took a critical deposition in the *Hicks* bellwether case.

For the contributions of Brenes Law Group, I recommend an award of $325,000.00.

### 3.   Dickerson Oxton, LLC

Adam Evans joined Dickerson Oxton in May of 2022 and has continued in his leadership role, working approximately 20 hours to help ensure the success of the settlement.  He has spoken with various counsel educating them about the global settlement and encouraging participation in the settlement.  For these efforts, I recommend Dickerson Oxton be awarded $5,000.00.

c. __Plaintiff Steering Committee and Other Firms with Significant Contributions__

i. <u>Wright & Schulte, LLC</u>

The significance of the work performed by Wright & Schulte attorneys was not necessarily reflected in the number of common benefit hours submitted. Wright & Schulte contributed approximately 760 hours and that work significantly advanced the litigation. Dennis Mulvihill, an experienced and formidable litigator, worked tirelessly during the height of corporate depositions, either taking or actively participating in the preparation of depositions for at least eight important corporate witnesses. Richard Schulte and his colleagues also contributed as "problem solvers," throughout the litigation and helped shape the larger strategic direction of the litigation. Wright & Schulte's contributions continued after settlement as well. Mr. Schulte was central to the success of the March 17, 2021 Zoom hearing providing information regarding the settlement to over 800 counsel and plaintiff attendees. In addition, his team helped draft some of the MSA language and other important settlement communication documents.

In recognition of the contributions of Wright & Schulte, which may not have worked an extensive number of hours on the litigation but whose hours were of great value, I recommend an award of $400,000.00 for common benefit fees.

ii. <u>CR Legal Team, LLP</u>

Todd Harvey was an integral part of the PSC and he performed substantive work of significant value throughout the life of the litigation, working approximately 1,350 hours for the common benefit. CR Legal Team was willing and able to support Lead Counsel and the PEC with whatever was needed. Mr. Harvey and his colleagues assisted with targeted document review in preparation for the depositions of corporate witnesses. Mr. Harvey's greatest contribution, however, was during the bellwether process. His firm assisted with bellwether case selection and

was heavily involved in the case-specific work up of the bellwether cases, including preparing bellwether plaintiffs for their depositions, preparing for and taking the depositions of several treating physicians, and preparing for and taking the depositions of several defense experts. Mr. Harvey's decades of experience ensured that the bellwether cases were set up for the best chances of success – both to survive defense motions and maximize chances of a plaintiff verdict at trial. Moreover, aggressively working up bellwether cases, even of mixed quality, shows that Plaintiffs' counsel are committed and should be taken seriously as a trial threat. In recognition of the contributions of Mr. Harvey and his firm, I recommend an award of $425,000.00.

### iii.   Upton & Hatfield, LLP

Russell Hilliard was appointed as Plaintiffs' Liaison Counsel. Though the approximately 615 hours submitted by Upton & Hatfield represented only a small portion of the overall hours spent on the litigation, the work performed by Upton & Hatfield attorneys was of great import. Mr. Hilliard served in two important capacities – as Liaison Counsel and as local counsel. As Liaison Counsel, Mr. Hilliard was in communication with attorneys nationwide and fielded questions about numerous topics related to the litigation. As local counsel, Upton & Hatfield served as a valuable resource due to their familiarity with local rules, customs, and practice in the District of New Hampshire, and their availability for coordinating with the Court. Attorneys from Upton & Hatfield reviewed all pleadings, discovery responses, and other documents filed on behalf of plaintiffs, advised on strategy, and attended every hearing and status conference. It is the opinion of Lead Counsel that Mr. Hilliard and his team went above and beyond the role of a typical Liaison Counsel and were a valuable contribution to the success of this litigation. As such, I recommend an award of $225,000.00 for Upton & Hatfield.

### d.    Other Plaintiff Steering Committee Firms

Attorneys from these firms had leadership appointments and were involved at the outset of the litigation.  These firms made valuable contributions to the start of the litigation, getting it off to a strong start to ensure long-term success.

#### i.    Fleming, Nolen & Jez, L.L.P.

Kelsey Stokes (appointed to the PSC) and David Hobbs performed the bulk of common benefit work for their firm (approximately 440 hours).  Ms. Stokes was involved in the bellwether side of litigation.   On behalf of all bellwether cases, she was heavily involved in drafting oppositions to Atrium's motions to dismiss the bellwether cases.  She conducted legal research, helped frame the arguments, and drafted sections of the responses that would be common across cases.  She also actively litigated the case of her bellwether client, Robert Newell, preparing Mr. Newell for his deposition and preparing for and deposing Mr. Newell's implanting physician.  Mr. Hobbs performed meaningful, focused document review to search for "hot docs" and information to flesh out company witness involvement in the products subject to the litigation and to craft event timelines.  Mr. Hobbs used this information to prepare several White Papers offering detailed summaries about various company witnesses, which served as useful resources throughout the litigation.  For Fleming, Nolen & Jez' contribution, I recommend an award of $100,000.00 in common benefit fees.

#### ii.    Levin Papantonio Rafferty Proctor Buchanan O'Brien Barr Mougey P.A.

Robert Price (appointed to the PSC) and Levin Papantonio Rafferty provided resources early in the litigation to quickly review documents (both targeted searches and nontargeted review) in order for Plaintiffs' leadership to get an early handle on plaintiffs' liability case, the relevant witnesses in the case, and the jurisdictional issues which proved to be a critical part of the litigation.

The firm's document review (which comprised 94% of the firm's approximately 1,165 hours) was done by contract attorneys and helped serve as the basis for several White Papers that were used for depositions of several Atrium employees.  For Levin Papantonio, I recommend an award of $75,000.00 for common benefit fees.

            iii.    <u>Wagstaff Law Firm</u>

Attorneys and staff at the Wagstaff Firm worked approximately 325 hours in support of the common benefit.  Kim Dougherty, (appointed to the PSC) and other attorneys at the firm provided helpful support to Plaintiffs' leadership, including conducting legal research and drafting memoranda regarding relevant First Circuit and New Hampshire case law for use in future briefing, performing assigned document review, and assisting with some motions practice including motions to strike Atrium's affirmative defenses in bellwether cases and review of privileged logs to support a motion to compel discovery.  For Wagstaff Law Firm's contribution, I recommend an award of $20,000.00 for common benefit fees.

**e.    Non-Leadership Firm Contributions**

            i.    <u>Taylor Martino Rowan</u>

Taylor Martino's common benefit work (approximately 115 hours) was entirely in relation to their bellwether case, *Petersen v. Atrium*, 1:18-cv-212.  Pursuant to Section IV.C.1.i. of the Participation Agreement, "work performed as part of the approved bellwether process" could be considered common benefit work at the discretion of the PEC.  Because bellwether cases and the accompanying risks and costs of litigation helped facilitate settlement discussions and the global settlement created significant benefit for all plaintiffs, I recommend an award of $5,000.00.

ii.    <u>Cory Watson Attorneys</u>

Cory Watson worked approximately 155 hours, all in relation to their bellwether case, *Hickenbottom v. Atrium*, 1:17-cv-713.  For the firm's work in relation to its bellwether case, I recommend an award of $5,000.00.

**V.    Conclusion**

For the reasons set forth herein, I recommend that the Court order that $14,485,000.00 in common benefit fees be awarded and disbursed from the Funds to the firms in the amounts as set forth herein.

Respectfully submitted,

_____

Ellen K. Reisman
REISMAN GREENE THEIS LLP
1200 18th Street NW, Suite 1225
Washington, D.C. 20036
202-695-7712
Ellen.Reisman@rgtlegal.com